STATE OF NEVADA, Plaintiff and Respondent, *v.* OWEN CAUDLE BUTNER, Defendant and Appellant.

No. 3545

July 6, 1950.                                    220 P.2d 631.

see 66 Nev. 127, 206 P.2d 253.

*Griswold & Vargas,* of Reno, *John R. Ross,* of Carson City, *Leslie E. Riggins,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *Homer Mooney,* Assistant Attorney General, *W. T. Mathews,* Special Assistant Attorney General, *R. L. McDonald,* Deputy Attorney General, *Harold O. Taber,* District Attorney, *John C. Bartlett* and *Gordon R. Thompson,* Deputy District Attorneys, all of Reno, for Respondent.

## OPINION

By the Court, BADT and EATHER, JJ.:

On May 4, 1950, after due and careful consideration, the undersigned two justices signed an order, without opinion, denying the petition. Two months of more or less continuous conferences failed to bring unanimity among the three members of the court, and we have felt constrained to express our views as briefly as may be.

With Hon. Frank McNamee, district judge, assigned to this case by the governor of Nevada by reason of the illness of the chief justice, we unanimously affirmed the judgment of the district court on the jury's verdict of first-degree murder with the death penalty imposed. State v. Butner, 66 Nev. 127, 206 P.2d 253. Thereafter the court, with the same personnel, after due consideration but without opinion, denied a rehearing. Appellant has now filed a second petition for rehearing, frankly admitting that he asserts as error the same assignment

as stated in his appeal and in his first petition for rehearing—that the trial court abused its discretion in admitting the testimony of a lay witness to the effect that in his opinion the defendant was sane at the time he shot and killed his estranged wife. In the meantime petitioner had sought a writ of certiorari from the Supreme Court of the United States upon the ground that the admission of the testimony of such lay witness was a denial of due process, 338 U.S. 950, 70 S.Ct. 479. That court however refused to issue the writ.

The petition must be denied.

We refrain from comment on the question of the propriety or legality of a second petition for rehearing raising the same assignment of error disposed of in the opinion on the appeal and raised in the first petition for rehearing.[1]

We also refrain from comment on the legality or propriety of the consideration of such second petition for rehearing by a member of the court who was disabled by illness from participating in the consideration of the original appeal, from hearing the oral argument on such appeal and from participating in the determination of the first petition for rehearing—when the district judge assigned to the case, and who sat in the appeal, heard the arguments, wrote the unanimous opinion of the court and joined in the consideration of and the

---

[1]But see State v. Jon, 46 Nev. 418, 438, 211 P. 676, 217 P. 587, 30 A.L.R. 1443, in which COLEMAN, J., speaking for this court, said: "Counsel for appellants have presented a second petition for a rehearing wherein they urge a point not before suggested. This court has on several occasions held that a second petition for a rehearing would not be entertained when urged by the same party. Brandon v. West, 29 Nev. 135, 85 P. 449, 88 P. 140; Ward v. Pittsburg Silver Peak Co., 39 Nev. 80–103, 148 P. 345, 153 P. 434, 154 P. 74. [q. v.]

"The practice pertaining to petitions for rehearing is governed by rule 15, which applies to criminal and civil cases alike, and the holding that a second petition for a rehearing will not be entertained in civil cases controls in criminal cases as well. State v. Hazzard, 76 Wash. 586, 137 P. 143; Ross v. State, 16 Wyo. 285, 93 P. 299, 94 P. 217; People v. Northey, 77 Cal. 618, 19 P. 865, 20 P. 129."

order denying the first petition for rehearing, was still available.[2]   Those questions are not here passed upon.

We refer to the original opinion, State v. Butner, 66 Nev. 127, 206 P.2d 253, 255, for a recital of the facts. We consider it proper however to repeat that lay witness Watkins, an eyewitness to the shooting and whose acquaintance with the defendant covered a period of "from three to eight minutes," first testified to the facts and that from such facts he reached the opinion that the defendant was sane at the time.   On cross-examination he stated:  "I noted at the time of the occurrence that when he pointed the gun at me and told me to roll her over and see if she was dead, that he wasn't drunk, or he wasn't crazy.  I mean, he was deliberate and cold."

   No difficult question of law is involved.  In this state and in virtually every other jurisdiction in the United States[3] a lay witness (1) having had adequate opportunity for observation, may (2) after stating the facts, (3) give his opinion as to the sanity or insanity

[2]The general rule appears to be that the special or pro tempore judge retains jurisdiction until the final determination of the case. See annotation 134 A.L.R. 1130;  Fisher v. Puget Sound Etc. Co., 34 Wash. 578, 76 P. 107.  The texts appear unanimously to support this view.

Section 4 of article VI of the state constitution provides:  "In case of the disability or disqualification, for any cause, of the chief justice or either of the associate justices of the supreme court, or any two of them, the governor is authorized and empowered to designate any district judge or judges to sit in the place or places of such disqualified or disabled justice or justices * * *."   The governor's proclamation refers to this section of the constitution, to the chief justice's inability to participate in case No. 3545, The State of Nevada v. Owen Caudle Butner, and designates Hon. Frank McNamee "to hear and act in respect to said cause and said matter, and the matters properly connected therewith until a decision therein has been finally reached, and I authorize him to discharge according to law the duties of the said office and enjoy the same, together with all the powers and privileges thereunto appertaining until said cause be finally decided and determined by the said supreme court."

[3]In Massachusetts a nonexpert witness may not testify in criminal cases as to the sanity of the person in question.  In New York he may only characterize the acts of the person as rational or irrational.

of the person involved, whereupon (4) the weight to be given to his testimony is a matter for the jury's determination. (5) In determining the sufficiency of the witness' observation of the person whose sanity is in question, no court and no text writer,[4] out of the hundreds of cases considered, has seen fit to lay down a rule of law, other than that (6) it lies in the sound discretion of the trial judge, and that (7) the appellate court will not interfere with the exercise of that discretion, unless (8) there has been an abuse thereof.[5] We adhere to the unanimous opinion of this court on the appeal to the effect that there was no such abuse of discretion by the trial court.

Petitioner asserts that the authorities are overwhelmingly opposed to the law asserted in the unanimous opinion of this court, but this is simply not so. On the contrary, there is little, if any, dissent as to any of the eight elements we have postulated above. The many cases cited by petitioner in which the appellate courts have held that there was no abuse of discretion in *rejecting* the proffered testimony, and the many cases cited by petitioner, in which the appellate courts have held there was no abuse of discretion in *admitting* the proffered testimony, all lend support to the view expressed in this court's opinion. That opinion followed the rule laid down by this court in State v. Lewis, 20 Nev. 333, 22 P. 241, 246, in which, after explaining the difficulty of laying down any general rule establishing the requisite knowledge which a witness must possess to permit him to express his opinion, the court said that he is a competent witness if he "has had sufficient observation to enable him to form a belief [on the subject]." And after holding further that "the admissibility of this character of testimony must necessarily be left, to a

---

[4] In Montana, by statute, the right of lay witnesses to testify is limited to those having an "intimate acquaintanceship" with the person.

[5] In Nevada, "unless it clearly appears" that there has been an abuse thereof. State v. Lewis, 20 Nev. 333, 22 P. 241, 246.

great extent, to the discretion of the presiding judge," the court concluded: "[A]nd when the testimony is admitted, unless it clearly appears that there has been an abuse of that discretion, the appellate court ought not to interfere." State v. Plunkett, 62 Nev. 258, 265, 142 P.2d 893, 149 P.2d 101, followed the ruling in State v. Lewis. Petitioner seeks to distinguish the Lewis case and the Plunkett case because in the former the witness had sufficient opportunity of observation "to arrive at a *correct* conclusion" as to the defendant's sanity, and in the latter case the proffered witness had not had sufficient opportunity of observation "to be competent to express a *correct* conclusion" as to defendant's sanity. (Emphasis supplied.) Dr. Bromberg, a psychiatrist called by defendant, testified that he was insane when he shot his wife. Dr. Tillim and Dr. Work, psychiatrists called by the state, testified that he was sane. Which one of them had sufficient knowledge to arrive at a "correct" conclusion? Dr. Anderson and Dr. Valenta, not psychiatrists, testified that defendant was insane. Dr. DeCosta and Dr. Sanders, not psychiatrists, testified that he was sane. Which of them had sufficient knowledge to express a "correct" conclusion? An array of lay witnesses testified that in their opinion defendant was insane. Besides Watkins (for the admission of whose testimony a reversal is sought) other lay witnesses testified that in their opinion defendant was sane. Which of these witnesses had had sufficient opportunity of observation to express a "correct" conclusion? It is obvious that both groups, whether lay or expert, diametrically opposed as they were, could not have arrived at "correct" conclusions. This attempt to distinguish the Lewis and Plunkett cases is futile.

The reference to this array of expert and lay witnesses on both sides (to say nothing of the actual facts of the case and the prior threats made by the defendant, and the eleven letters written by defendant to his wife from Texas during the period preceding the homicide

when defendant's expert witnesses testified defendant was insane)[6] also refutes the oft repeated assertions in both the first and second petitions for rehearing that appellant is being sent to his death on the testimony of Watkins. The jury heard all this evidence.

Petitioner asks that in the event we do not reverse the judgment, we modify the same by reducing the degree of the crime from first-degree murder to second-degree murder. Subdivision 6,of sec. 11032, N.C.L. 1941 Supp., provides: "When the verdict is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

With reference to this section this court in State v. Robison, 54 Nev. 56, 6 P.2d 433, 436, said: "The statute does not purport to clothe the court with power to modify a judgment in a criminal case without giving or ordering a new trial, as a matter of leniency, but only when the judgment is not supported by the evidence which does show the defendant guilty of a lesser degree of the crime for which he was convicted, or of a lesser crime included therein. There was, however, as we have indicated, evidence upon which the jury could legally base a verdict of murder."

■ The request for an order reducing the degree of the crime must accordingly be denied.

■ Petitioner asks further that, if we refuse to reverse the judgment, and if we also refuse to reduce the degree of the crime from murder of the first degree to murder of the second degree, we should nevertheless

---

[6]Neither these letters nor copies thereof appear to be included in the record on appeal. Respondent however, in its reply to the second petition for rehearing, says: "Each of said letters, it is submitted, was the product of a well oriented, reasoning mind." Petitioner does not contradict this statement, and apparently his expert witnesses did not testify contra.

reduce the penalty from death to life imprisonment. If appellant was insane when he shot his wife, he should, under our law, suffer no penalty whatever. If he was sane, it was an atrocious murder. He was accorded two separate hearings before the board of paroles and pardons of this state. Those hearings were upon his first application for commutation of sentence and later upon his second application for commutation of sentence. In both of these hearings he was given full opportunity, through his counsel, to present such witnesses and such arguments as he might desire. Both petitions were denied. The power to commute the sentence from death to life imprisonment is vested exclusively in the board of pardons and parole commissioners by the provisions of sec. 14 of article V of the state constitution. State v. Moran, 43 Nev. 150, 182 P. 927. Initially, it is the exclusive function of the jury to fix the penalty at either death or life imprisonment. Section 10068, N.C.L.1929, as amended. 1947 Stats., chap. 91, p. 302. The request to reduce the penalty from death to life imprisonment must accordingly likewise be denied.

Petition denied.

HORSEY, Chief Justice.

I dissent from the order of this court denying the certain petition of the defendant and appellant, Owen Caudle Butner, for a second rehearing and reconsideration in the above-entitled cause, which was filed in this court on the 6th day of April, 1950, whereby it was petitioned that the decision and judgment rendered by the court be modified, for the reasons and upon the grounds in such petition set forth, and that, for such purpose, this court, upon its own motion and pursuant to the provisions of rule XV of the rules of the supreme court of the State of Nevada, recall the remittitur in said cause, theretofore, on or about the 12th day of August, 1949, filed with the clerk of the Second judicial district court of the State of Nevada, in and for the county of Washoe.

On the 12th day of April, 1950, a hearing upon a petition for a writ of habeas corpus being then in progress and about to be concluded before this court, and the petitioner having conceded that there was not sufficient basis or ground for petitioner's discharge upon habeas corpus, and that same should be dismissed, the petitioner thereupon presented, and requested this court to consider, the above-mentioned petition for a second rehearing and reconsideration.

I, as chief justice, pursuant to my duties to preside in this court upon that occasion, had read carefully such petition for a rehearing, and was impressed (among other statements and allegations) with the following statements on pages 1 and 2 thereof:

"The petitioner respectfully requests such rehearing and reconsideration upon the ground that palpable error and grievous wrong exist in connection with the previous rulings of this Honorable Court in sustaining the action of the Trial Court in permitting the witness Jack Watkins to express an opinion, over the objection of the petitioner, as to the sanity of the petitioner, such opinion being based only upon acquaintance, observation and knowledge for an admitted period of 3 to 8 minutes, and during such period, by the witness' own admission, he was under great strain, stress and nervous excitement, and upon the further proposition and ground that under all of the evidence adduced in this cause as to the intoxication of petitioner, the verdict of the jury finding the defendant guilty of murder in the first degree and affixing the death penalty, and the sentence of the Trial Court imposing upon the defendant the death penalty, should be reduced and mitigated in accordance with the power and jurisdiction existing in this Honorable Court, pursuant to the provisions of Subsection 6, Section 11032, N.C.L.1931–41 Supp., to reduce the said sentence from the death penalty to one of life in prison.

"At the outset, petitioner respectfully and humbly states to this Honorable Court that in requesting this

rehearing and reconsideration, petitioner is not unmindful or unaware of the previous consideration of this Honorable Court given to the points in question and the previous determinations of this Court in connection therewith, and were it not for the fact that petitioner is under a sentence of death, petitioner would refrain from presenting this petition to the Court in deference to this Court's previous consideration and to the general policy of finality in determination. On the other hand, petitioner, with the same degree of respect and humility, states to this Honorable Court the sincere, conscientious and absolute conviction of himself and his counsel that the existing determination standing presently as the law of the State of Nevada, with reference to the admissibility of the opinion of the witness Jack Watkins, is erroneous in principle, is contrary to the common law of England and to nearly all adjudicated law otherwise existing in the United States, and should not stand as the law of the State of Nevada."

It seemed to me that there was sufficient merit to justify further consideration as to whether or not an error of law by the honorable trial court of the Second judicial district court, department No. 2, had occurred in relation to the overruling of the objection and the admission in evidence of the testimony of the witness, Jack Watkins, and that it appeared entirely reasonable to believe that this court, consequently, had failed fully to give sufficient force and effect to the reasoning ably set forth in such petition for a second rehearing.

It seemed unreasonable to believe, according to my view, that the testimony of said Watkins, upon the basis of his having an acquaintance with Butner of only the short period of from three to eight minutes, as appears in the record, was competent, or, on the other hand, whether such evidence was properly admissible.

Other reasons also appeared to me, at the time and prior thereto, worthy of consideration. Among such reasons were matters stated by the late Mr. Chief Justice

TABER in his able opinion in the case of Wood v. State, 60 Nev. 139, 104 P.2d 187, on pages 140 and 141 of 60 Nev., and on page 188 of 104 P.2d, as follows:

"The second paragraph of rule XV of this court reads: 'The court may, on its own motion, recall a remittitur in any case, for good cause, and may recall such remittitur, for good cause, upon application noticed or made within fifteen days after the filing of the same in the trial court.'

"The only case cited by appellant in support of his position that we should entertain his present motion, even after judgment of affirmance and denial of petition for rehearing, is In re Rothrock, 14 Cal.2d 34, 92 P.2d 634. In that case a motion to recall the remittitur was granted because, in issuing it, the court had inadvertently assumed that no motion for a new trial had been made, when in fact such a motion had been made. We are not confronted here with that or any similar situation. Furthermore, that case recognizes the rule that a remittitur will be recalled when, but only when, inadvertence, mistake of fact, or an incomplete knowledge of the circumstances of the case on the part of the court or its officers, whether induced by fraud or otherwise, has resulted in an unjust decision. See 23 Cal.Law Review 354–356. In the article on Criminal Law in 8 Cal.Jur., at p. 641, § 613, the rule is thus stated: 'When a remittitur has been regularly issued and filed, and there has been no violation of law or the rules of the appellate court, and no mistake of facts and no fraud or imposition practiced by the prevailing party upon the court or upon the losing party, the jurisdiction of the appellate court over the case is at an end. The judgment is final and the court is without power to recall its remittitur.'

"In the case at bar the remittitur was regularly issued, and there has been no inadvertence, fraud, imposition, false suggestion, misapprehension or mistake of fact. Furthermore, the court is of opinion that there is no error either in the opinion and decision on appeal or in the opinion and decision on petition for rehearing."

Analyzing the language there employed by Mr. Chief Justice TABER, in referring to In re Rothrock, 14 Cal.2d 34, 92 P.2d 634, the matters upon the basis of which a remittitur would be recalled, as above set forth, include, among other factors, "an incomplete knowledge of the circumstances of the case on the part of the court or its officers." It was clearly apparent that I, due to illness, was absent from the court for precisely three months, to wit, from the 17th day of February, 1949, to the 17th day of May, 1949, and during that time was unavoidably prevented from performing my duties as a member of the court and as its presiding officer.

The opinion in State v. Butner, 66 Nev. 127, 206 P.2d 253, was filed in this court May 10, 1949, only seven days before I returned to the court. The opinion, by the Honorable Frank McNamee, district judge, was written and completed prior thereto, and, such district judge having been commissioned by his excellency, the governor, to sit in my place and stead during my temporary disability and absence, it was, of course, entirely proper that said district judge should also serve with the other justices of this court, Senior Justice MILTON B. BADT and Junior Justice EDGAR EATHER, in considering, acting upon and making proper disposition of the first petition for rehearing, which was, by such Justices BADT and EATHER, and District Judge McNamee, denied on, or as of, the 11th day of August, 1949. The notation appended to the order was: "HORSEY, C. J., being absent on account of illness, the Governor designated Hon. Frank McNamee, Judge of the Eighth Judicial District, to sit in his stead."

Long thereafter, however, to wit, April 12, 1950 (which was nearly eleven months after my above-mentioned return, to wit, on May 17, 1949, and about eight months after the said first petition for rehearing was denied) was the time at which the petition for a second rehearing and reconsideration (filed April 6, 1950) was, while this court was then in session, on said 12th day of April, 1950, presented by petitioner's

counsel. It was apparent that unless the remittitur had been ordered recalled, then and there, by this court from the court below, this court would have lost jurisdiction. The carrying into effect and operation of the execution of the judgment and sentence of the petitioner had been stayed and held in abeyance merely by the stipulation of the state and the defendant (the petitioner) until the conclusion of the proceedings then in progress before this court, and as soon as such habeas corpus proceeding would have ended, and the petitioner ordered remanded, such jurisdiction would, necessarily, have terminated. There seemed no alternative possible except by recall of the remittitur. Certainly, there would have been no legal justification for further proceeding upon habeas corpus, when petitioner's counsel had conceded there was no further basis therefor, and consented to a dismissal of that proceeding. I, in discussing the matter before this court and respective counsel, in open court and in the presence of the petitioner, referred to the fact that I had had "an incomplete knowledge of the circumstances of the case on the part of the court or its officers," due to the fact that the case was argued before this court on behalf of the defendant, Butner, while I was ill, and I had not had the benefit of the argument in the hearing upon the appeal, nor as to the first petition for a rehearing, the latter having been considered and denied by Mr. Justice BADT, Mr. Justice EATHER and District Judge McNamee. And yet, in order to prevent loss of jurisdiction and to prevent the early carrying into effect of the sentence of death, I, as it clearly appeared to me, was required to act, intelligently and properly, then and there, in association with the other justices, during the above-mentioned session of court, on April 12, 1950, or else it would forever, at least from a practicable standpoint, have been too late for any further consideration, no matter how reasonable and impelling the facts and statements in the petition for a second rehearing and reconsideration appeared to be. So, knowing, as I did,

that I had "an incomplete knowledge of the circumstances of the case on the part of the court or its officers," which would require further study, and, also, that a serious error of law (meaning, in effect, such a "violation of law" as was referred to by Mr. Chief Justice TABER in Wood v. State, supra), according to many authorities presented in said first petition for rehearing, had occurred, I, together with Mr. Justice EATHER, concurring, ordered the remittitur to be returned from the Second judicial district court to this court. Mr. Justice BADT dissented.

Such error of law as that to which Mr. Chief Justice TABER referred, on page 141 of 60 Nev. on page 188 of 104 P.2d in Wood v. State, as embodying the language in 8 Cal.Jur. at page 641, sec. 613, was as follows: "When a remittitur has been regularly issued and filed, and there has been *no violation of law* or the rules of the appellate court, and no mistake of facts and no fraud or imposition practiced by the prevailing party upon the court or upon the losing party, the jurisdiction of the appellate court over the case is at an end." (Italics mine).

The converse is, of course, true, and it is as clearly implied that if a violation of law or error of law has occurred, the remittitur will be recalled. There is no constitutional provision, or statute, which I have been able to find or which has been brought to my attention (in which, upon an occasion such as occurred on April 12, 1950, in such proceeding, and in which the question was whether the remittitur should be recalled in order that the members of the court could feel free to consider the petition for a second rehearing and reconsideration) in which the chief justice was not entitled to act, in the interest of justice, precisely as I did, in the instant proceeding. Further reference should be made, also, to said case of In re Rothrock, 14 Cal.2d 34, 92 P.2d 634, and, particularly, to the further authorities on pages 636 and 637 therein, in which are cited the case of Rowland v.

Kreyenhagen, 24 Cal. 52; also a note in 23 California Law Review at page 354; also the case of State v. Ramirez, 34 Idaho 623, 203 P. 279, 280, 29 A.L.R. 297. See, also, State v. Hawkins, 121 S.C. 290, 114 S.E. 538, 27 A.L.R. 1083 (containing an able statement of various phases of questions as to the right of a supreme court to recall its remittitur upon sufficiently good reasons or causes).

It would, in the circumstances at the time, on April 12, 1950, have been entirely inexpedient, if not altogether impracticable, to have determined that the Honorable Frank McNamee, district judge, should, then and there, have been considered to have been still commissioned to sit in the subsequent and much later proceeding, in which sufficient merit appeared from the facts and statements of the petition as to have justified the recalling of the remittitur. As to whether such a *special judge* during the temporary illness of the regular judge should have continued to act eight months later, for the purpose of a further or second petition for rehearing and reconsideration, or whether the present regular justice should have served as to that particular proceeding, reference is made to a valuable and well-considered annotation entitled, "Substitution of Judge in Criminal Case," such annotation being in connection with the case of Commonwealth of Pennsylvania v. Joseph Thompson, Appt., 328 Pa. 27, 195 A. 115, also reported in 114 A.L.R. 432, and in which such annotation commences on page 435 and continues to and including page 443.

Some consideration will now be given to the aforementioned case of In re Rothrock, supra, and particularly to some of the matters included in the Rothrock opinion, to wit, on pages 636 and 637 of 92 P.2d. Certain excerpts contain pertinent paragraphs in relation to the basis for a second rehearing and reconsideration and the recalling of a remittitur under proper circumstances. Such excerpts and paragraphs, from which quotation is made, are, respectively, taken from the above-mentioned cases of Rowland v. Kreyenhagen,

supra, and State v. Ramirez, supra. In said case of In re Rothrock, supra, on said pages 636 and 637, of 92 P.2d, is the following:

"A mistake of fact on the part of an appellate court which results in prejudicial error or a miscarriage of justice affords a proper ground for recall and correction of the remittitur. This is well settled. Exceptions to the general rule that an appellate court loses all control and jurisdiction over a cause after the remittitur has been issued by its order and filed in the court below, were declared in this state in 1864, in the case of Rowland v. Kreyenhagen, 24 Cal. 52. It was there said: '* * * This general rule rests upon the supposition that all the proceedings have been regular, and that no fraud or imposition has been practiced upon the Court or the opposite party; for if it appears that such has been the case, the appellate Court will assert its jurisdiction and recall the case. Against an order or judgment improvidently granted, upon a false suggestion, or under a mistake as to the facts of the case, this Court will afford relief after the adjournment of the term; and will, if necessary, recall a remittitur and stay proceedings in the Court below. This is not done, however, upon the principle of resumption of jurisdiction, but upon the ground that the jurisdiction of the Court cannot be divested by an irregular or improvident order. In contemplation of law, an order obtained upon a false suggestion is not the order of the Court, and may be treated as a nullity. If, under color of such an order, the proceedings have in part found their way back to the Court below, yet in law they are considered as still pending in the appellate Court, and that Court may take such steps as may be necessary to make the fact and law agree.' This doctrine is quoted with approval in Trumpler v. Trumpler, 123 Cal. 248, 55 P. 1008, and Isenberg v. Sherman, 214 Cal. 722, 7 P.2d 1006.

"In a note in 23 California Law Review at page 354, which digests numerous authorities on the subject, the following conclusion is expressed: 'It would appear

from these cases that a remittitur will be recalled when, but only when, inadvertence, mistake of fact, or an incomplete knowledge of all the circumstances of the case on the part of the court or its officers, whether induced by fraud or otherwise, has resulted in an unjust decision.'

"In State v. Ramirez, 34 Idaho 623, 203 P. 279, 280, 29 A.L.R. 297, a criminal case wherein the defendant had been convicted of murder and his punishment had been fixed by the jury at death, the supreme court of the state of Idaho had under consideration the question of its power to recall a remittitur. The ground urged in support of the motion to recall was 'that counsel failed to fully brief and argue the question of the power of this court to modify the judgment by reducing the penalty to life imprisonment, and that this court was led into error by reason of a suggestion that it was without such power.' After reviewing authorities from many jurisdictions, and quoting the doctrine of Rowland v. Kreyenhagen, supra, as being in conformity with the preponderance of judicial authority, the court concluded that a proper case for the exercise of its power to recall and correct its mandate was presented, saying: 'This court, upon respondent's suggestion, assumed, although it did not decide, that it had no power to reduce the penalty fixed by the jury. We do not mean to be understood as inferring that fraud or imposition was practiced upon this court by either of the parties connected with the cause, but if the court fell into error it was by reason of the fact that counsel failed to properly brief and present the question now under consideration. The questions involved here are of the utmost importance to appellant, and every consideration of justice demands that this court determine its power both to recall the remittitur and to reduce the punishment in this case, and that the punishment be reduced if the facts do not warrant the imposition of the death penalty. While the circumstances of this case do not require the adoption

of so broad a rule as is followed in New York or Oklahoma, yet there is ample authority to justify us in holding that this court retains jurisdiction of an appeal, during the term at which a judgment is rendered, where such judgment was inadvertently given, in consequence of a false suggestion * * *.' See, also, Municipal Bond Co. v. City of Riverside, 138 Cal.App. 267, 32 P.2d 661; Haydel v. Morton, 28 Cal.App.2d 383, 82 P.2d 623; 2 Cal. Jur., p. 1068, sec. 634; note 84 A.L.R. 579, 591, et seq.; 3 Am.Jur., p. 754, par. 1264; 5 Cor.Jur.Secundum, Appeal and Error, sec. 1996, p. 1561."

In the instant case, it is my view, after most careful consideration from the record, that the trial court (perhaps due to pressure of time and insufficient opportunity for full consideration, as is often the case in the midst of such trials), in the matter of the testimony of Jack Watkins, apparently did not fully conceive or realize the full import and effect of the many authorities which clearly have held that in order for a lay witness to be qualified or competent to testify upon the question of whether or not a person alleged to have committed a serious crime was sane or insane at the time of the commission of the act, such witness, in order that such evidence may be deemed admissible, must have been then in possession of sufficient association, acquaintance and knowledge as to have justified the witness in reaching a sufficiently sound and reasonable conclusion. Not only is it unwise and valueless to permit any such evidence when no sufficient foundation has existed or upon which same may be predicated, but, on the contrary, it is, unquestionably, misleading and dangerous.

Referring to the trial court in which the Honorable A. J. Maestretti presided, in the Second judicial district court, in and for the county of Washoe, Department 2, I truly believe that it was highly erroneous for the learned district judge to have overruled the objection and to have permitted the witness, Jack Watkins, to have testified that in his (Watkins') opinion Owen Caudle

Butner was sane, notwithstanding the admitted fact that on December 30, 1947, the only time Watkins had ever seen Butner, or had any acquaintance, association or knowledge of him whatever, was upon that occasion, concerning which he testified in detail and which covered only from three to eight minutes.

After reading and considering many of such authorities, and finding no contrary view whatever based upon evidential fact rather than conjecture or conclusion, it appears clear that the said honorable district judge was mistaken in his conception, and that such ruling and order in admitting such evidence by way of ultimate conclusion to the effect that Butner, at the time of the shooting of the deceased, was sane, was erroneous, and, in my view, constituted reversible error.

Such misconception in conceiving the existence of sufficient opportunity for observation, association, acquaintance and knowledge, in the matter of Jack Watkins' visit of not more than about eight minutes, as to enable Watkins to have become intelligently and reasonably informed as to the subject's mental condition, is almost beyond the pale of any substantial credence or reasonable belief, as will be treated and dealt with further on in this dissenting opinion, particularly in discussing some of our own Nevada cases, especially State v. Lewis, 20 Nev. at pages 333 to 363, 22 P.2d 241, wherein Mr. Chief Justice HAWLEY, one of the greatest jurists who ever served upon this court, has cited many authorities upon the question involved in that case, which is similar in its facts and reasoning to the instant Butner case, and I find myself unable to question the efficacy, soundness, salutary principle and strength of such reasoning.

But, before reaching that opinion and the other Nevada cases, and, in connection with some of them discussing certain phases and questions at some length, and, as to others, merely referring to them, I shall state, further, that, as a basis for recalling said remittitur, on April 12, 1950, one of the principal reasons, as above

indicated, was because of there being too short a time, from three to eight minutes, in which Jack Watkins could have acquired, reasonably, from any common-sense viewpoint, sufficient observation, acquaintance or knowledge upon which he could have predicated an opinion of any value or admissibility, as to Butner's mental condition.

Likewise, referring again to In re Rothrock, supra, and, particularly, to Rowland v. Kreyenhagen, supra, I shall refer, particularly, again to one sentence of the opinion in In re Rothrock, on page 636 of 92 P.2d, as follows: "A mistake of fact on the part of an appellate court which results in prejudicial error or a miscarriage of justice affords a proper ground for recall and correction of the remittitur."

Much may be said, also, as to the statement as to "fraud or imposition" as justifying, in a proper case, the recalling of the remittitur. And it would reasonably appear that permitting the witness, Jack Watkins, to give such opinion to the effect that petitioner, Owen Caudle Butner, was sane upon the occasion in question, in view of the absence of any substantial acquaintance or knowledge on his part, was so mistaken, even so grossly careless and negligent in its effect, as to have amounted to "imposition." There was ample justification, therefore, for the recalling of the remittitur.

The question of "mistake of law" is so apparent as to require little further mention or reference. The facts above detailed, at length, as to the admissibility of the *conclusion* of Jack Watkins to the effect that Butner was sane, after the trial court had overruled defendant's objection and permitted Watkins to testify to such opinion or conclusion, thereby placing same before the jury and in the record, constituted, in my view, at least, such a misconception, not only of fact but of law, as to have constituted error of law, and, in consequence, same was, and is, reversible error.

In this Nevada Supreme Court there is no case (except the very recent instant case of State v. Butner,

supra,) in which the rule or doctrine in relation to permitting a lay witness to express an ultimate opinion or conclusion as to whether or not a subject is sane or insane is at variance with or different from the great weight of authority upon that question. No witness, insofar as I have been able to find, has been permitted, in any well considered case in the federal or state courts, except in the states of New York and Massachusetts, with, perhaps, one or two exceptions, to state, without clearly or well-defined qualifications or conditions, his ultimate opinion or conclusion to the effect that the mental condition of the person involved is sane or insane.

One of the most comprehensive and exhaustive treatments of the subject which has come to my attention is in connection with the case of State of Washington, v. Schneider, 158 Wash. 504, 291 P. 1093, 72 A.L.R. 571. A valuable annotation in connection with that case is captioned, as to subject matter, "Competency of Testimony of Nonexperts on Question of Sanity or Insanity in Criminal Cases." The reported case of State v. Schneider, supra, commences on page 571 of 72 A.L.R. and said annotation immediately follows, on page 579 thereof, to and including page 587. The general rule, in section I of the said annotation, and the subject matter, on page 579, is as follows:

"I.  General Rule.

"In all, with the exception of two jurisdictions, it is held that in criminal cases nonexpert witnesses will not be permitted to express a general opinion as to sanity; nor can they give an opinion independent of the facts and circumstances within their own knowledge; but they may detail the relevant facts known to them, and thereupon express an opinion as to the sanity of the person whose mental condition is being investigated. The value of such testimony will depend largely on the opportunities of the witnesses for correct observation of the appearance and conduct of the person whose mind

is claimed to be unsound, as well as the character of such appearance and conduct."

Then follows a vast collection of cited cases, arranged alphabetically as to states and the District of Columbia, and which includes representative cases from about forty territorial jurisdictions. The rules in New York and Massachusetts are exceptional. On page 586, of 72 A.L.R., referring, in the annotation, to the subheading "II. Rule in New York," it is stated: "In New York the general rule is slightly modified, so that a nonexpert witness may testify as to the acts of the person whose sanity is in question, and characterize them as rational or irrational, but may not give an opinion as to sanity or insanity." (Citing many New York cases.)

And on page 587, of 72 A.L.R., referring to subheading "III. Rule in Massachusetts," is the following statement of the rule: "In Massachusetts the general rule is repudiated, and *under no circumstances is nonexpert testimony competent in criminal cases,* on the question of sanity or insanity." (Italics mine.)

In such a vast collection of representative cases, as above stated, and eliminating New York and Massachusetts for the reasons set forth, all of them, with their varying expressions and phraseology, clearly recognize *the qualifying or conditional statements and circumstances of fact and the implied or express limitations* which will permit or justify a trial court, in a case in which a person is alleged to have committed a criminal offense at a time at which he is alleged to have been insane, to receive and admit testimony of a lay witness, in which, by way of his ultimate opinion or conclusion, he states that such person is sane or insane. A typical and well-considered case involving such question of competency of such a witness under such circumstances, expressed with ability and clarity, is the opinion in the case of State v. Schneider, supra. In the opinion in that case, 158 Wash. 504, 291 P. 1093, 1096, at page 577 of 72 A.L.R. it is stated: "It is unquestionably the rule

that, before nonexpert testimony as to the mental condition of a party to an action may be rendered competent, the witness must show an acquaintance with the party, concerning whose mental condition he is testifying, *of such intimacy and duration as to clearly indicate that he was well enough acquainted with such person to render his testimony of value in determining the issues presented for decision, and he must also testify as to the certain specific acts of such person which form the basis for his conclusion as to the mental condition of such person.*" (Italics mine.)

In that case the trial court committed reversible error in sustaining the objection to a question propounded to the witness Eden, and in not permitting such witness to testify. It is clearly apparent why the supreme court, by Judge Beals' opinion, determined that such reversible error had occurred, because the witness, Eden, had known the defendant, Schneider, off and on for a long time, was well and familiarly acquainted with him, that they worked together at the brewery for twelve years, and that the witness stated in detail many acts and occurrences and certain changes in Schneider's acts and conduct about two weeks prior to the killing; "that during this two weeks' period he had noticed a difference in appellant's conduct, and had observed appellant standing with his head bent, talking to himself, and that appellant had gone downhill fast and 'didn't know what he was doing any more'; that on one occasion appellant had allowed a batch of brew to freeze while he was watching it; and, again, that appellant was 'half of the time out of his head.'" In spite of the lengthy testimony of the witness, Eden, and the question of appellant's counsel, to wit, "Now, from all he said and all you heard and your observation of his conduct, Mr. Eden, what would you say as to whether or not he was in his right mind," to which respondent's counsel (the state) objected upon the ground that there was not sufficient foundation laid, and the objection was sustained, and Mr. Justice Beals, therefore, 158 Wash. 504, 291 P. 1093

on page 1097, 72 A.L.R. on page 577, after further statements and expressions in his opinion, reached the following determination:

"It must be held that the testimony of the witness Eden fulfills these conditions. *He had known and worked with appellant for twelve years, and testified that during the period of two weeks prior to March 31 a change had apparently come over appellant, concerning which the witness testified specifically and at length.*

*"Under the prior decisions of this court, it must be held that in the case at bar the trial court committed reversible error in sustaining the objection to the question propounded to the witness Eden."* (Italics mine.)

Despite the long period of acquaintance, observation and knowledge acquired over about twelve years by the witness Eden, the action of the trial court in sustaining the state's objection caused the witness' testimony to have been denied admission, and, in the opinion by Mr. Justice Beals, the supreme court of that state, after having stated the reasons (as hereinabove set forth), reached the conclusion, and so held, that, in effect, Eden had fulfilled all the necessary conditions, and his testimony should have been admitted.

How different, by comparison, would have been the result, measured by the test so clearly reasoned by Mr. Justice Beals in the Washington case, if, under other circumstances, the witness Eden had been allowed to testify even in spite of the fact that Eden had known Schneider for a period of not more than from three to eight minutes, and had no other acquaintance with him or knowledge of him prior to the killing? By any creditable or reliable authority or reasoning could it be reasonably believed that the learned Supreme Court of the State of Washington could, or would, under circumstances similar to those in the instant case, have determined or held that such testimony would, or probably could, have been admissible?

It seems to me that fairness requires at least some mention of at least a few of the many authorities

referred to and briefly discussed and digested in said above-mentioned annotation 72 A.L.R. commencing on page 579 and continuing to and including page 587. The brief digests of some of such cases therein, on page 586, are hereby quoted as follows:

"In State v. Hogan, 1910, 145 Iowa, 352, 124 N.W. 178, where a witness had met the person under inquiry, a deaf-mute, only once, and had communicated with her by writing, it was held that the acquaintance was not general enough to allow an expression of an opinion as to sanity or insanity. See to the same effect, State v. Rohn, 1909, 140 Iowa, 640, 119 N.W. 88.

"In State v. Von Kutzleben, 1907, 136 Iowa 89, 113 N.W. 484, it was held that witnesses called from among bystanders at a trial were not competent to testify as to the sanity or insanity of the defendant, having observed only his actions on trial.

"In State v. Turner, 1927, 126 Me. 376, 138 A. 562, where the witness had seen and observed the defendant for only a few minutes, not more than twenty, it was held that he was not competent to express an opinion as to the defendant's sanity.

"A witness was held to be competent, in Bishop v. State, 1910, 96 Miss. 846, 52 So. 21, where he had seen the defendant every day or so while he was young, and had known him intimately for twenty-seven or twenty-eight years.

"In State v. Penna, 1907, 35 Mont. 535, 90 P. 787, two newspaper reporters who had talked with the defendant for about thirty minutes shortly after the homicide were held not to be 'intimate acquaintances' within the statute allowing such persons to express an opinion as to sanity or insanity.

"In Shields v. State, 1926, 104 Tex.Crim. 253, 283 S.W. 844, 845, the court said: 'The rule seems well settled in this state that a nonexpert witness, who has shown reasonable opportunity to observe the acts and conduct of the party inquired of, may state that he has never

observed anything in the acts, speech, demeanor, or conduct of such party which were peculiar or which led witness to believe or conclude such party of unsound mind or abnormal.' "

I have read and fully considered the first petition for rehearing, filed June 24, 1949, by able counsel on behalf of the petitioner, Owen Caudle Butner, and in which his counsel cited many cases. Some of the cases to which they referred will be hereinafter mentioned, and many more which have been cited and presented in connection with such petition have commanded my earnest attention and careful consideration, and I have noted with regret that my learned associates, Mr. Justice BADT and Mr. Justice EATHER, and the Honorable Frank McNamee, district judge then sitting in the hearing of arguments upon the appeal in said instant case and in such petition for rehearing, did not find it expedient, necessary or desirable that a further opinion be written subsequent to the hearing of the argument in connection with such petition and in ordering the denial thereof.

In view of the striking and impelling situation which has been disclosed, to my mind, both as to the first petition for a rehearing and, also, in connection with the petition for a second rehearing and reconsideration in the instant proceeding, in which my learned associate justices have, by a majority vote, decided and ordered that, on such petition for a second rehearing and reconsideration, same should be denied, I have, with reluctance, found myself impelled to dissent.

As above indicated, I most seriously question, in view of the overwhelming weight of authority, as to whether the honorable district judge, A. J. Maestretti, upon the trial in the district court, did not commit reversible error in admitting in evidence the testimony of the witness Jack Watkins, and in which he was permitted to state before the jurors that in his opinion Owen Caudle Butner was sane at the time of the alleged killing, on December 30, 1947.

Noting again the able reasoning of the opinion by Mr. Justice Pattangall, of the Supreme Court of the State of Maine, in State v. Turner, supra (and to which reference has been made in 72 A.L.R. in the annotation, on page 586), that learned justice, in the opinion, in 126 Me. 376, 138 A. 562, stated, on page 563, the following: "But the evidence offered would have been rejected in any court. The record does not show that the witness had sufficient opportunity to form any such opinion as would have enabled him to have answered intelligently the questions asked him. If he had been an expert alienist, it would have been no abuse of the wide discretion given the court concerning the reception of expert testimony to have rejected the evidence. We certainly know of no jurisdiction in which the opinion of a lay witness, as to the sanity of a man, whom he has seen less than 20 minutes, would be regarded as admissible. The rejection of this evidence, from any point of view, was eminently proper."

And on pages 10 and 11 of the first petition for rehearing, filed June 24, 1949, the opinion of the Supreme Court of the United States in the case of Turner v. American Security and Trust Co., 213 U.S. 257, 29 S.Ct. 420, 53 L.Ed. 788, on pages 789 and 790, has been quoted from at length. Quoting in part from the said opinion in the Turner case, on said pages 789–790 of 53 L.Ed. that high and learned court stated: "This is not to say that, in a very clear case, an appellate court ought not to review the discretion of the trial judge. For instance, if it should appear that the witness had never spoken to the testator or seen any significant act, but merely observed him driving from day to day through the streets, and the opinion of such a witness as to sanity had been received, it would be the duty of the appellate court to correct the error. On the other hand, if the witness for years had been in constant communication with the testator, had frequently conversed with him and observed his conduct from day to day, the exclusion of the opinion of the witness ought to be corrected by the

appellate court. These are instances of a plain abuse of judicial discretion."

In this dissenting opinion I feel impelled to consider and briefly to discuss the three Nevada Supreme Court cases, to wit: State of Nevada v. Harrington, 12 Nev 125; State v. Lewis, 20 Nev. 333, 22 P. 241, and State v. Plunkett, 62 Nev. 258, 265, 142 P.2d 893, 149 P.2d 101.

As to the matter of the opinion of a witness in the Harrington case, supra, the general rule was followed, the subject not being one involving the matter of the sanity or insanity of the then defendant. From the syllabus, the witness "testified that just preceding the shooting, deceased had hold of the defendant; that defendant was trying to free himself, and having described the action of the parties, was asked: 'What did he (deceased) appear to be doing with his hand or arm?' the court refused to allow the question: *Held,* not to be erroneous, inasmuch as the witness had already stated all he saw or knew, and that the question called for an opinion, not the statement of any fact."

As to the facts and the reasoning of the opinion in State v. Lewis, supra, written by the very learned jurist, the late Mr. Chief Justice HAWLEY, I will hereinafter consider and discuss the portions of such opinion as may seem, herein, advisable.

In the case of State of Nevada v. Plunkett, supra, the late Mr. Justice DUCKER, stated, on page 284 of 62 Nev., 149 P.2d 110: "It is insisted that it was error to sustain the state's objection to the following question asked of Mazie Chester, a witness for defendant: 'Q. I ask you to state, from your acquaintance with him, as to his appearance of having rational mental capacity?' There was no improper exercise of discretion in this ruling. The witness had met defendant only twice and there is nothing to show that the meetings were otherwise than casual, without opportunity for such observation as would have enabled the witness to form any judgment of value as to his mental condition. As said in State v. Lewis, 20 Nev. 333, 22 P. 241, 246: 'The

court must be satisfied that the witness has had opportunity, by association and observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but as to the extent and character of the evidence, no better rule can be established than to leave it within the discretion of the court.' "

The fundamental rule, therefore, first fully elucidated, explained and applied in State v. Lewis, supra, was followed, with approval, in State of Nevada v. Plunkett, supra.

. Mr. Chief Justice HAWLEY'S exhaustive and able opinion in the Lewis case, written by him in 1877, has been, and still remains, the law of this state in relation to a lay witness giving his opinion as to sanity or insanity, with its necessary qualifications and conditions as to competence and the admissibility of such opinion evidence, at least prior to the opinion in State v. Butner, supra. It has seemed advisable to quote rather fully from State v. Lewis, supra, commencing on p. 346 of 20 Nev., and on p. 245 of 22 P. as follows: "There was no strict rule applied as to the general knowledge of the witnesses introduced by the defense. Great latitude was allowed upon both sides. Some of the facts stated by the witnesses for the defense, and upon which their opinions were based, did not even tend to establish insanity in the remotest degree; and the reasons given by some for their opinions were very weak, and in a few instances so unreasonable and absurd as to be unworthy of mention. On the other hand, some of the witnesses who testified on the part of the State had such a brief acquaintance with and limited knowledge of the appellant as to deprive their testimony of any special weight or value. The witness Hume, against the admission of whose opinion the argument of counsel is principally based, testified that he had only known defendant for about four months prior to the homicide; that he saw him every day during the summer; that he generally met him as he went to breakfast; that he sat at the same table, and ate with him once or twice; that he

noticed him around the house; that he observed his manner of speech and conversation; that he saw him in the evening and night before the homicide; that on the morning after the homicide he went to Bullion with him, and had considerable conversation on the way. The real question to be determined by the jury was as to appellant's sanity or insanity at the time of the homicide. The testimony as to the condition of his mind at times previous and subsequent thereto is admissible solely upon the ground that it tends to show the mental condition at the time of the homicide. The acquaintance of this witness with appellant, although slight, embraced a very important period of time. He saw him just before and immediately after the commission of the act. His knowledge seems to have been sufficient to enable him to form and express an opinion, and we cannot say that he did not have sufficient opportunities to arrive at a correct conclusion in regard to the condition of appellant's mind. When the opinions of such witnesses, from the necessities of the case, are received as evidence, the weight of their testimony does not depend so much upon the number as upon the intelligence of the witnesses, and their capacity to form correct opinions, their means of information, the unprejudiced state of their minds, and the nature of the facts and circumstances testified to in support of their opinions. It would, perhaps, be difficult to lay down any general rule establishing precisely the requisite knowledge which a witness must possess in order to justify or warrant the expression of an opinion. It may, however, be safely said that if the witness has had sufficient observation to enable him to form a belief upon the question he is a competent witness. The admissibility of this character of testimony must necessarily be left, to a great extent, to the discretion of the presiding judge; and when the testimony is admitted, unless it clearly appears that there has been an abuse of that discretion, the appellate court ought not to interfere. In Baldwin v. State [12 Mo. 238], the court said: 'Before a witness should be received to testify as to the condition

of mind, it should appear that he had an adequate opportunity of observing and judging of capacity. But so different are the powers and habits of observation in different persons that no general rule can be laid down as to what shall be deemed a sufficient opportunity of observation, other than that it has in fact enabled the observer to form a belief or judgment thereupon; and the weight of his opinion must depend upon a consideration of all the circumstances under which it was formed.' 12 Mo. 238. In Brown v. Com. [77 Ky. 398], the court, in discussing this question, said: 'Exactly what is meant by the expression in some cases, when such evidence has been admitted, that "the witnesses must detail the facts upon which the opinion is based," we do not find explained. If the admissibility of the opinion as evidence must depend upon the facts from which it is formed it is manifest that there is a question for the court antecedent to its introduction, and that to promulgate a general rule as to the amount and quality of the evidence that should satisfy the court in every case would be impossible. The court must be satisfied that the witness has had an opportunity, by association and observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but as to the extent and character of the evidence no better rule can be established than to leave it within the discretion of the court. * * * It must vary with the circumstances of each case, and by these circumstances the jury must determine for themselves the weight to which the opinion may be entitled. It is not intended that the admissibility of the evidence shall be made to depend upon the ability of the witness to state specific facts, from which the jury may, independent of the opinion of the witness, draw a conclusion of sanity or insanity; for it is the competency of the opinion of the witness that is the subject of inquiry. The ability of the witness to detail certain facts which are in themselves substantive evidence of the condition of the mind, may add very greatly

to the weight of the opinion given in evidence, but they will not of necessity affect the question of competency.' "

A few of the important features gleaned from the reasoning of Mr. Chief Justice HAWLEY's very clear and able opinion should, it is believed, be properly emphasized. Judge HAWLEY said the witness Hume *"had only known defendant for about four months prior to the homicide; that he saw him every day during the summer; that he generally met him as he went to breakfast."* Reference is made, also, to the detailed facts above mentioned, from which it is clearly apparent that at least for a considerable period of time (for about four months) the witness Hume had known and been acquainted with the defendant, Lewis, and had observed him. And Judge HAWLEY said, based upon such facts: "His knowledge *seems to have been sufficient to enable him to form and express an opinion,* and we cannot say that he did not have sufficient opportunities to arrive at a correct conclusion in regard to the condition of appellant's mind." (Italics mine.) It is significant that Judge HAWLEY, because of the witness' observation and knowledge of *four months,* did not say positively and with emphasis that same "seems to have been sufficient" * * * "and we cannot say that he did not have sufficient opportunities," the learned judge thus writing with caution, rather than with positive certainty.

It should be particularly noted, also, further quoting from said opinion: "On the other hand, some of the witnesses who testified on the part of the state *had such a brief acquaintance with and limited knowledge of the appellant as to deprive their testimony of any special weight or value"* (Italics mine) ; although, in that particular case: "There was no strict rule applied as to the general knowledge of the witnesses introduced by the defense," and that: "Great latitude was allowed upon both sides," which may have caused Judge HAWLEY not to speak quite so positively as perhaps he otherwise would, in reference to depriving "their testimony of any

special weight or value," rather than expressly to have denied the admissibility of the testimony of such witnesses; nevertheless, it is apparent that there was a wholesome thread of consistent reasoning throughout Judge HAWLEY'S opinion. Such reasoning was that Hume's testimony, having "special weight or value," it had effect upon the right to its admissibility, because "his knowledge seems to have been sufficient to enable him to form and express an opinion," it being apparent that if he did not present such sufficient knowledge, the condition precedent, to wit, that he was competent to form and express such opinion, such admissibility must, necessarily, have been denied.

Judge HAWLEY cited many authorities, and expressly discussed them in the opinion. The learned jurist, on pages 347 and 348 of 20 Nev. on page 246 of 22 P., quoted from Brown v. Commonwealth, 14 Bush 405, and, in that connection, stated: "* * * The court must be satisfied that the witness has had an opportunity, by association and observation, to form an opinion as to the sanity of the person in reference to whom he is to speak; but as to the extent and character of the evidence no better rule can be established than to leave it within the discretion of the court."

And at another point it was there stated by Judge HAWLEY that: "The admissibility of this character of testimony must necessarily be left, to a great extent, to the discretion of the presiding judge; and when the testimony is admitted, unless it clearly appears that there has been an abuse of that discretion, the appellate court ought not to interfere. In Baldwin v. State, the court said: 'Before a witness should be received to testify as to the condition of mind, it should appear that he had an adequate opportunity of observing and judging of capacity.'"

Referring to the testimony of Jack Watkins, a witness for the State in the instant case, the State offered such testimony, to which the defendant objected, and the matter was argued at some length before Judge Maestretti. Defendant's counsel strongly contended, in effect, that

before such evidence could properly be admitted, a sufficient foundation should be laid, and which had not been done. After further discussion between the respective counsel and the court, Mr. Bartlett, for the State, said he would "lay a further foundation, if Your Honor please."

"The Court: You may proceed.

"Mr. Bartlett: (Q.) Did you know the defendant, Butner, before this time, Mr. Watkins? A. I did not.

"Q. And for how long a period of time would you say you saw him on that evening from the time you first saw him in the house, until after he had left? A. That would range from three to eight minutes.

"Q. And you have never had an opportunity since then to know or observe the defendant with any particularity, have you? A. Other than sitting in the courtroom.

"Q. Now, basing your answer upon the fact that you have seen other people who are insane, and upon your observation of this man at the time of the shooting, do you have an opinion as to whether or not at that time he was sane or insane?

"Mr. Vargas: For the record, if the Court please, we will make the same objection.

"The Court: The Court's understanding is that the defense relies upon the insanity of the defendant existing at the time of the commission of the act. That being true, the objection is overruled, and you may answer the question.

"The Witness: (A.) Well, at the time of the shooting, *I would say* that he was *very* sane." (Italics mine.)

It is apparent that the honorable trial judge, in overruling said objection and permitting the witness, Watkins, to state his opinion and conclusion to the effect that the defendant "was *very* sane," entirely failed to take into account the necessity of determining:

First, whether or not there were sufficient facts testified to by the witness, Watkins, to have *assured that such witness was competent, by way of his above-stated conclusion, that the defendant was sane. In the light of the tremendous weight of authority, did such facts, for*

*instance, as to whether the observation, acquaintance
and knowledge during the very short period of from
three to eight minutes, as the witness testified, afford to
such witness any intelligent and common-sense basis
upon which to reach his ultimate conclusion that the
defendant was, at the time of the shooting of the
deceased, sane?* The witness, insofar as he knew, had
never seen the defendant before, and had had absolutely
no prior acquaintance or association with the defendant
whatsoever, and, of course, had not before observed him,
nor neither had he any knowledge of or concerning him.
As hereinbefore set forth in regard to the defendant,
Lewis, in State v. Lewis, supra, the witness Hume had
known Lewis about four months, had seen him every day
during the summer, generally met him as he went to
breakfast, noticed him from time to time around the
house, and observed his manner of speech and conversa-
tion, saw him in the evening and the night before the
homicide, and on the morning after the homicide the
witness went with Lewis to Bullion, and they had con-
siderable conversation on the way; and upon such facts,
measured by the well-thought-out and careful reasoning
of the able Judge HAWLEY, there was sound and rea-
sonable basis to conclude, as that learned jurist did con-
clude, that sufficient foundation was thereupon estab-
lished to permit the witness Hume's testimony to be
admitted.

There is a very great difference and contrast as
between the foundational facts in the Lewis case and
those in the instant case of State v. Butner; such differ-
ence is as great, by way of comparison, as that between
day and night. Because of such *substantial* acquaintance
during the four months in which Hume knew Lewis,
there were contacts between them, in which there
were happenings, occurrences, salutations, conversa-
tions, actions and conduct, which naturally, were
observed by Hume, and by which he had the means of
observing and of becoming acquainted with and coming
to know, and of actually knowing, Lewis. It was just

such day to day association and intimacy of acquaintance during such period of four months (not four minutes) which afforded to the witness, Hume, the reasonable opportunity to be able to sense and determine, intelligently (assuming that Hume was a man of ordinary capacity, ability and common sense), and to acquire and express his opinion as to whether or not the defendant in that case, Lewis, was sane or insane. As before pointed out, Chief Justice HAWLEY, after most careful reasoning, and because of such facts in the Lewis case (which were so dissimilar to those in the instant case, above described), concluded that same were sufficient *in duration and extent, reasonably to show that the witness, Hume, was competent.* The following sentence expressed by Judge HAWLEY in his opinion in the Lewis case, on said page 346 of 20 Nev., on page 245 of 22 P. may bear repetition, same being as follows: *"On the other hand, some of the witnesses who testified on the part of the state had such a brief acquaintance with and limited knowledge of the appellant as to deprive their testimony of any special weight or value."* (Italics mine.)

State v. Lewis, supra, was decided in 1889. As above indicated, this court, fifty-five years later, in State of Nevada v. Plunkett, expressly affirmed the reasoning of State v. Lewis, supra, and, in that connection, in the opinion of Mr. Justice DUCKER, in effect, affirmed the judgment of the lower court, in that said court declined to admit the testimony of the witness Mazie Chester, a witness for defendant. The sustaining of the objection and declination to admit such evidence was by reason of the fact (employing the language of the able Mr. Justice DUCKER), that: "The witness had met defendant only twice and there is nothing to show that the meetings were otherwise than casual, without opportunity for such observation as would have enabled the witness to form any judgment of value as to his mental condition." [62 Nev. 258, 149 P.2d 110.]

The evidence in the voluminous transcript before this court has presented in great detail the testimony of many

witnesses who testified at the trial before the trial judge, the Honorable A. J. Maestretti. Much of the evidence consisted of the expert testimony of a considerable number of professional physicians and scientists. It required many weeks, or, in some instances, months, of research to enable them to ascertain, investigate, analyze and become familiar with the available facts and circumstances by which they, severally, determined their opinions and conclusions. Some of the expert witnesses, as, of course, frequently occurs in such cases, finally, upon their respective hypotheses, reached opposite opinions or conclusions as to the basic question of whether or not, at the time of the homicide, the defendant, Butner, was sane or insane. Much evidence has been adduced, which included facts and circumstances which were conceded and admitted, whilst other of such facts or circumstances were controverted.

There can be no doubt that the defendant, Butner, subsequent to his severe head injury in his youth, had started to drink intoxicating liquor, and that, as the years passed, such drinking progressively increased until it became habitual, and that for around two years, more or less, he had become what practically all the expert witnesses conceded, to wit, that he had become so addicted to imbibing large quantities of intoxicants that he was what is generally termed a "confirmed or chronic alcoholic."

The best scientific minds have long recognized such a condition, which, in advanced stages, is considered, medically and scientifically at least, as a serious affliction, resulting in progressive deterioration, both of body and mind.

Numerous facts and circumstances detailed in the testimony of the several witnesses have disclosed a number of instances of defendant Butner's behavior, which, as to certain occurrences and conduct, were eccentric, and, at times erratic, strained, unusual, unstable and abnormal. It is also undeniable that shortly prior to the tragic death of Butner's former wife, Mrs. Mildred

Butner, the defendant, on that day, December 30, 1947, had drunk, as appeared from the evidence, "a pint of whiskey, followed by several drinks at the Golden Gulch Bar and a drink or two at Dougherty's Bar, and that he drank the contents from a bottle of Cheracol, containing one grain of codeine and two grains of chloroform, within 20 minutes prior to the homicide. It is also undisputed that petitioner's blood contained a percentage of .216 alcohol and his urine contained a percentage of .339 alcohol, and that this quantity of alcohol definitely placed him under the influence of alcohol according to approved medical standards." (Quoted from the second paragraph on page 9 of the petition for a second rehearing and reconsideration.)

A few months before the homicide Butner had, after their remarriage and before the last divorce, told his wife he intended to make a trip to San Francisco, and, apparently, had, on the other hand, found himself on a bus about to arrive at Salt Lake City, and from there Butner, apparently without any good reason other than that he was "drunk," had, together with Ted Green, a brother-in-law, who also had indulged in drinking on that occasion, journeyed to Texas, and remained there several weeks, during which time he wrote his wife most endearing letters. Such letters were written and posted at the rate of one, and sometimes two, per day.

It is not advisable to attempt to state further detailed facts and circumstances in the evidence which show, or tend to show, that on December 30, 1947, shortly prior to and at the time of the homicide, the defendant was at least in an abnormal, and perhaps an irrational, condition of mind.

The jurors, at the trial, heard, or are presumed to have heard, all of the testimony adduced by the witnesses. The salient point is as to whether or not, during such period of three to eight minutes, the witness Watkins could possibly have ascertained any facts as to Butner's mental condition, other than the bare facts which he saw *immediately before* and *for a few minutes*

474

*after* the killing occurred. The witness could, of course, have stated, and did state, the actual facts and circumstances which he had seen and heard during such few minutes. That principle was clearly stated by this court in State v. Harrington, supra, in which, in effect, the court justified the testimony *as to facts and circumstances, but stated that no evidence consisting of merely his opinion or conclusion. could have been properly admitted.* (Italics mine.) Such testimony by way of *ultimate conclusion* has, from time immemorial, been deemed inadmissible, same being merely the opinion of such a witness, and, therefore, conjectural.

There was nothing whatever which the witness Watkins knew, or could have known, relating to the mental condition of the defendant, other than the facts which he saw and heard during such three to eight minutes. The witness Watkins stated that "he (Butner) was not drunk, and he was not crazy," or words to that effect. Watkins, from the conduct, conversation and what actually occurred thereafter, which he beheld, certainly knew a most tragic and tense and extraordinary situation had occurred. Not knowing the persons involved, Butner nor his former wife, Mildred, Watkins, without having known or been acquainted with Butner for any appreciable length of time, and not having some substantial opportunity in which to have observed him, could not, reasonably, have been enabled, intelligently and with any common-sense standpoint, to have determined whether or not Butner was sane, and, without any such basic foundation, Watkins should not have been permitted to say (as he said before Judge Maestretti): "The Witness: (A.) Well, at the time of the shooting, *I would say* that he was *very* sane." (Italics mine.)

Such statement could have been no more than a mere "guess." Without any scientific knowledge as an expert, Watkins had no knowledge or information which came to him hypothetically, and could not, of course, have so testified even if some one had imparted such facts to him, not being qualified as to such expert, or scientific,

field of knowledge. The only available means by which, as a layman, Watkins might have been considered qualified or competent (as has been repeatedly pointed out in this opinion) would have been by actual observation, acquaintance, association and knowledge, *and of sufficient extent and duration* such as reasonably could have enabled him to have acquired, from the individual characteristics, habits, conduct and actions of the subject, a sound and reasonable determination as to whether such subject was sane or insane at the time of the homicide. Nothing less would have sufficed, or come within the principles so fully elucidated and expounded by the overwhelming weight of the authorities, including the very many state court cases from all, or nearly all, the states, except New York and Massachusetts, above mentioned. In those two states the particular question here before us, for the reasons above stated, was inapplicable.

For the reasons abundantly shown, from more than forty of the forty-six states, the federal courts and the District of Columbia, including all those in the State of Nevada, I have found it inevitable, and feel constrained, to conclude that the honorable district judge arrived at his above-mentioned erroneous conclusion, and did so in the exercise of his discretion, in that he permitted the witness Watkins to state such conclusion above mentioned, and that same constituted *an abuse of his discretion*. Such abuse of his discretion was clearly unsound, and constituted reversible error. The denial of a new trial by the trial court to the defendant, Butner, also was, according to my judgment, erroneous and reversible.

The opinion written by the Honorable Frank McNamee, district judge, concurred in by Mr. Justice BADT and Mr. Justice EATHER, and filed May 10, 1949, also, in my best judgment, was erroneous, and instead of affirming the judgment of the trial court, same should have been reversed by this court, and the case ordered sent back for a new trial; or, in the alternative, and upon the

offer of defendant, Butner, in the exercise of the discretion of this court and in view of the serious error of the trial court in admitting the evidence of Jack Watkins, and which, if same were eliminated, would not have assured the jurors of having found beyond a reasonable doubt that the killing was deliberate and premeditated, the judgment and sentence could properly have been modified by this court on an order made reducing the sentence or penalty to life imprisonment. Subsection 6, sec. 11032, N.C.L.1931–1941 Supp. Such was done, in somewhat similar circumstances in State v. Holdaway, opinion by TABER, J., in 56 Nev. 278, 48 P.2d 420.

It may be stated, by way of explanation, that there could not have been, nor can this court find, any reasonable assurance with a reasonable degree of certainty that the jurors were not influenced by the testimony of Watkins. If that incompetent evidence had been excluded, as it should have been in accordance with practically all authorities, there is nothing to show that the jury would not have arrived at the conclusion and found that the defendant, Butner, should have been acquitted because of his having been determined temporarily insane, or, at least, that the killing was not willful, deliberate and premeditated, and that a lesser degree of murder was indicated. If such unjust and erroneous result was thus caused by such incompetent evidence having been admitted (and the reasoning of the cases establish that it was), the great and humane principle of presumption of innocence was discarded, and because of such grave error in permitting such incompetent evidence, the defendant may reasonably be deemed to have been found guilty of first-degree murder beyond a reasonable doubt, upon such false basis. The resulting erroneous conviction and sentence to death naturally followed.

With regret, I am impelled again to refer to the fact that, as to the matter of the petition for a rehearing filed June 24, 1949, notwithstanding the fact that in such

petition of 23 pages able and clear reasoning was presented and many further authorities added, all three of the then sitting members of the court, before whom such first petition for rehearing was submitted, still adhered to the opinion filed May 10, 1949, as aforesaid, and the petition for a rehearing was, as aforesaid, on August 11, 1949, denied, without any further opinion having been written.

Petitioner's counsel, doubtless realizing fully that an erroneous and wrongful result had been confirmed by the denial of the first petition for a rehearing, again on April 6, 1950, petitioned for a second rehearing and reconsideration. Counsel for petitioner "respectfully and with humility" requested such rehearing and reconsideration, "upon the ground that palpable error and grievous wrong exist in connection with the previous rulings of this Honorable Court in sustaining the action of the Trial Court in permitting the witness Jack Watkins to express an opinion, over the objection of the petitioner, as to the sanity of the petitioner, such opinion being based only upon acquaintance, observation and knowledge for an admitted period of 3 to 8 minutes, and during such period, by the witness' own admission he was under great strain, stress and nervous excitement, * * *." But, as before stated earlier in this dissenting opinion, such second petition for rehearing and reconsideration has been denied by two of the honorable justices of this court, Mr. Justice BADT and Mr. Justice EATHER. This has been brought about, likewise, without any further opinion having been written, thereby perpetuating, as I see it, the erroneous determination reached in the opinion filed May 10, 1949, whereby the judgment of the trial court was affirmed.

In the circumstances, how can any one, in justice or truth, state that the admission in evidence of the opinion of Jack Watkins, when he possessed knowledge, acquaintance or observation of Owen Caudle Butner of only from three to eight minutes duration, did not cause

such incompetent evidence to have misled the jury in finding the defendant, Butner, guilty of first-degree murder, and in imposing upon him the sentence of death?

Bearing in mind that the jurors were confronted with the testimony of the expert witnesses—the doctors and psychiatrists perhaps having been about equally divided in their opinions—it seems reasonable to believe that it may reasonably be deemed to have been the positive assertion of Watkins' incompetent evidence which may clearly have "turned the tide" and produced the result which followed. Again, I respectfully and humbly inquire: What has become of the principle of presumption of innocence, or of the doctrine adhered to consistently under the common law and all Anglo-Saxon jurisprudence, which requires that before guilt of a crime charged may lawfully be established, the defendant must be found guilty of the crime charged, according to law, beyond a reasonable doubt as to his guilt, and, particularly, as to the degree of the crime of which he is convicted? Naturally, the jurors may have been weary from the effects of the lengthy and detailed evidence of the expert witnesses, conflicting and controversial as it was, which was before them at the trial; and the mere fact that the learned district judge overruled the objection and permitted the witness, Watkins, to testify positively and with great assurance that Butner "was *very* sane," may readily have prompted the jury to have felt relieved by what appeared to be the simple, clear statement uttered by Watkins, and to have "seen" the way of relief from, perhaps, difficulty and uncertainty. This may have appeared, in the conception of the minds of the jurors, sufficiently, or at least satisfactorily, true, because they, doubtless, may reasonably have felt assured that such construction must have been correct and right, for the reason that such opinion of Watkins had been, after the objection was overruled by the trial court, admitted, and that such testimony of Watkins, as the jurors believed, had the trial court's sanction and approval.

In conclusion, it has been, and is my well-considered belief and judgment that a serious and grave error of law, amounting to an abuse of discretion by the trial judge, occurred in permitting the testimony of the opinion or conclusion of the witness Jack Watkins; that a similar error of law has occurred on the part of this court in affirming the judgment of the trial court, and its denial of a new trial, and, also, in this court's denial of the first petition for a rehearing; and, also, that a similar error, equally grave, has occurred on the part of the members of the majority of the justices of this court, in the matter of the petition for a second rehearing and reconsideration. It is also my considered judgment that, by reason of such incompetent and erroneous evidence a wrong result has been reached, thereby having caused a miscarriage of justice and the denial of due process of law.

Such petition for a second rehearing and reconsideration, with all due respect to the views of my learned associates, should have been granted and ordered by this court.