## STATE *v.* HOLDAWAY
No. 3023
September 5, 1935.                    48 P. (2d) 420.

*Guy E. Baker,* for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews* and *Julian Thruston,* Deputy Attorneys-General; and *Roger Foley,* District Attorney, for the State:

## OPINION

By the Court, TABER, J.:

Appellant was convicted of murder of the first degree and sentenced to be executed. This appeal is from the judgment and from an order denying a new trial.

Briefs were filed as usual, but at the time set for argument both parties joined in an application to this court that said judgment be modified by remanding the cause to the trial court with directions to enter a judgment against the defendant (appellant) finding him guilty of murder of the second degree and to pronounce judgment upon him as prescribed by law.

The state was represented by the attorney - general and the district attorney of Clark County, where the trial was had. Defendant was represented by his attorney, Guy E. Baker of Las Vegas. As a basis for said application, said officials and attorney entered into the following stipulation, which appears in the minutes of this court: "It was stipulated by and between the Attorney-General, represented by Julian Thruston, his deputy, the District Attorney of Clark County, Hon. Roger Foley, and the attorney for the appellant, Guy Baker, Esq., as follows: That after a thorough study and review of the evidence set forth in the record in the above entitled action, and it appearing to us that the jury erred in finding the defendant, Guy Holdaway, guilty of murder in the first degree, and that the evidence adduced before the jury was not sufficient to sustain said judgment, it is conceded and stipulated that in our judgment the testimony in the record that the defendant at the time of the homicide was under

the influence of intoxicating liquor to the extent neces-
sary to render him, the said defendant, incapable of
committing the crime of murder in the first degree;
that except as to the testimony of Officer Jones there
is no evidence whatever in the record showing any
motive for the killing; that the testimony of Officer
Jones, which was in effect that in response to a ques-
tion by Jones: 'Why did you shoot the deceased?' the
defendant answered: 'He owed me forty dollars'; that
from the condition of the defendant at the time the
above statement was made, as shown by the testimony
of Officer May and other witnesses, it is likely that the
defendant was in such a condition as not to fully under-
stand the situation and appreciate the import of the
words contained in his answer to Jones; in fact, instead
of showing motive, the evidence, other than that of Offi-
cer Jones, established the fact that the relations between
defendant and deceased up to the time of the killing were
most friendly, the evidence disclosing no express malice
on the part of the defendant toward the deceased; so
that it is our judgment, for the reasons heretofore set
forth, that the defendant is not guilty of the offense
of murder in the first degree, but that it is the opinion
and judgment of the Attorney-General of the State of
Nevada and the District Attorney of Clark County that
the evidence clearly and amply shows the defendant to
be guilty of the crime of murder in the second degree,
and that the evidence adduced before the trial court
was and is sufficient to sustain a verdict of guilty of
murder in the second degree. Being of the opinion
heretofore stated, we ask that the judgment of the
trial court in and for the County of Clark, State of
Nevada, be by this court modified, and that the crime
committed be adjudged to be murder in the second
degree, and that the Court remand the case to the
trial court with instructions to impose sentence and
judgment upon the defendant in accordance with the
statute setting forth the punishment of murder in the
second degree."

Clause 6 of section 11032 of the Nevada Compiled Laws of 1929, as amended (Stats. of Nevada 1931, p. 48, c. 41, sec. 1), after stating that the trial court has power to grant a new trial when the verdict is contrary to law or evidence, goes on to say, "but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court ·may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed." The respective parties agreed that, in the event this court should decline to grant said application, the appeal proper be deemed submitted on the briefs on file therein.

While the stipulation entered into by the state and defendant is in no way binding upon this court, it nevertheless deserves our serious consideration, particularly in view of the fact that the officials representing the state are men of long experience in the prosecution of crime, men of good judgment, able, and fully alive to the responsibilities of their respective offices. We have therefore made a thorough and careful study of the record, for the purpose of determining whether the evidence warranted a verdict of murder of the first degree.

Appellant was charged, by information filed in the Eighth judicial district court, Clark County, with the murder of Eddie Brunner. These two men lived together in a cabin in that section of Las Vegas known as Old Town. At about 8 o'clock on the evening of January 14, 1933, Brunner was seen struggling on the floor of the cabin, and a few minutes later his dead body was found there, with a shotgun wound in the abdomen, extending back to the spine. Officers were called shortly after Brunner was first seen, still alive, on the floor. Appellant was in the cabin when the officers arrived, and in a few minutes they took him to jail.

Joe May, of the city police, a witness for the state, testified that appellant "didn't act like a drunken man— he talked funny — he didn't stagger, but he did talk funny  *  *  *  he kind of talked like he was half-crazy.  *  *  *  I thought he was full of dope or hop."

Police Officer Frank Jones, another witness for the state, testified that appellant "appeared to me to be kind of doped up — or hopped up.  *  *  *  He was under the influence of liquor, I thought, but I couldn't smell anything."

Tomar A. Markle, who lived with John C. Maner in a cabin next to that of Brunner and appellant, testified in behalf of the state that a few seconds before the "crash," which he did not at the time think was a shot, he looked through a window of the Holdaway-Brunner cabin and saw Brunner, at about 8 o'clock in the evening, "looking directly into the bedroom, or faced so he was turned in that position."  According to Markle, Brunner at that time said, "What in hell are you trying to do?"

Cecil Mathews, in behalf of appellant, testified that the latter's reputation in the community for peace and quietude was good.

Appellant, a lather by trade, testified that he was drinking on said day, and that he remembered nothing from about 6:30 in the evening until he awoke in jail the following morning.  During the day (January 14) he "got a half gallon jug of liquor" in the Williams addition, and took it to the cabin.  "Whiskey had been my downfall and had caused a lot of trouble.  I don't remember anything when I am drinking.  I never had anyone come to me and tell me that I had caused trouble or injured anybody in anyway.  I have been confined in an insane asylum about four times.  I don't think alcohol or whiskey had anything to do with my being confined to the State Hospitals.  I don't think whiskey in any way has caused my mental condition.  But whiskey was my mellow tension, that is what doctors have told me, might cause a man to get into the

condition I do when I am drinking or apparently drinking too much. It is a condition that I don't remember anything what happened. On January 14th, the last thing I remember at that time was, it must have been about six-thirty, I don't know just exactly what time. We were going to the show at that time. Eddie had his clothes on and was all ready to go. The last thing I remember or the last thing that I ever remember. * * * Never at any time have we had any argument at any time, nor did I have any ill feeling toward him, and I don't think he did for me for any reason at all. And there is no reason I know of why he should have. He never did at any time owe me forty dollars."

W. M. Lee, then a prisoner in said jail, charged by the federal government with unlawful possession of liquor, testified that on the night appellant was brought to the jail "he seemed to be awfully drunk. * * * When he woke up or got up, he was standing up, holding on to the bars, and he asked me what he was in jail for. I told him he killed a man and he asked me who he had killed and I told him Eddie Brunner. He said, 'I don't believe it.' He said, 'Eddie Brunner was my best friend.' "

John C. Maner, who lived in the cabin with Markle, testifying for the state, said that just before the officers entered the appellant's and Brunner's cabin, "as I passed the window Mr. Holdaway was sitting here by Mr. Brunner saying 'Eddie, wake up—what's the matter, Eddie?' * * * He had a dark expression— a kind of frown—or sad expression on his face."

Mr. Maner never knew of Eddie Brunner and appellant having any trouble. Mr. Brunner had spoken to witness several times, appellant not being present, "of what a good partner he (appellant) was." The last time Brunner had so spoken to witness regarding appellant was "probably not over three days" before January 14. There had been "drinking parties" in the cabin of Brunner and appellant on previous occasions, according to Maner. During the day of January 14, when appellant asked witness to have a drink, "I told

him I tried to drink all the stuff in the world, but I couldn't—and I had been off of it for two years, and I didn't want to drink any more. He said he had been off for four months and had got straightened out—got some work—bought some clothes and he thought he would celebrate a little." Witness testified that he saw appellant and deceased getting or eating dinner that same evening, probably about 5 or 5:30. They were talking right along, but not loud or boisterously — no rough talk as if they were quarreling. "If it had been boisterous I would have heard it." "I never did hear anything boisterous." The sound of what was later thought to be the shot "didn't sound like a shot, but a muffled shot." If he hadn't been told a shot was fired he wouldn't have believed that it was a shot. When Markle came in, he said to witness: "Them fellows are having trouble over there. And I heard something like that hit the other or hit the wall." Witness (Maner) testified further that one window in the room used by appellant and deceased as kitchen, dining room, and sitting room (the room where Brunner's body was found) had no shade, and that the electric light was "a big light—one of these large sized globes. Made a very brilliant glow." Witness testified that, when he went over after hearing the noise, he did not see any smoke or smell any powder smoke; also that lying on the floor, between the shoulders of deceased's body and the wall, was "a lathing hatchet or a shingle hatchet—something· like that." Testifying further concerning the look on appellant's face as the officers were taking him away, approximately eight or ten minutes after the sound was heard, Mr. Maner said that "he had a pretty bad look on his face. * * * The way it looked to me he was mad. Looking for. anything to cause him trouble. * * * A pretty bad scowl. * * * Like a man that is just mad—like he is mad, worried." He had never seen that expression on appellant's face at any other time. Appellant had walked out of the cabin with a shotgun in his hands very shortly after the sound was heard, and returned just before the

officers came. Appellant, while "hunkered down" over deceased's body, said "Eddie, wake up. What's the matter with you, Eddie?" several times—three or four or five. Witness (Maner) did not know what became of the hatchet. When the officers came, the jug was on the table about half full. Appellant could not see witness when the latter was looking at him while he was speaking to deceased's body. "I was looking in on the light. I could see him and he couldn't see out. If he had looked right up I don't suppose he would have seen me."

During the eight- or ten-minute period during which, as Mr. Maner testified, appellant was away from the cabin very shortly after the sound was heard, he had gone to the residence of Mr. and Mrs. Fred Miller, who lived next to the cabin occupied by appellant and Mr. Brunner. Some idea of how appellant was conducting himself may be gained by considering some of the testimony of Mr. Miller, who testified for the state: "Well, when I first seen him, some man knocked at the door and I opened the door and the defendant was standing just outside my door with a gun in his hand. I jumped out of the door and grabbed the gun. He had a shotgun—he had it in his hand. I asked him what he was doing and why he was fooling around my place with a gun and he said there had been some kind of a disturbance around his cabin or noise—or words to that effect. Then he came over to see if it was me. I told him I had no business around his cabin and I hadn't been there. He said that somebody was making a noise over there and he was trying to find out who it was."

After telling appellant about some trouble the Millers had had with some other parties a few nights before, Mr. Miller directed his wife to call the officers. This she did. "Said there were some parties around throwing rocks on the tent and making a disturbance. He said 'Yes, I also heard all of that over in my cabin— me and my partner. Every bit of it.'" After some more talk, appellant said to witness: "You take the gun and keep it. Then he said to me, 'Where did I

leave my car?' I said, 'You didn't come up here in no car.' My car was left standing out on the street. I said, 'You didn't come up in no car,' and he walked out to the side of the street to see if his car was there. We looked up and down the street and there was no car there, and I says, 'You didn't come up here in any, car,' and he still insisted he had his car, then he says, 'Come on over to my cabin,' and I says, ' I don't want to go to your cabin with you. My wife went to call the officers and I will stay here and wait for her then if I am gone she won't know what happened.' He says, 'Come on over to the cabin,' and I says, 'You go on over to your cabin and when my wife comes back I will come over and see you.' He went over to his cabin—his door was standing partly open. He went in the door and closed the door." Mr. Miller further testified that, when the officers came, and Mr. Potter accused appellant of the killing, the latter said: "Why he is the greatest pal I ever had—the best friend I ever had." When appellant arrived at Miller's residence, he did not have the gun in a threatening position. "No, kind of like a person would usually hold a shotgun or a rifle—he didn't have the barrel pointed at the door * * * the ordinary position a man would hold a gun under any circumstances where he wasn't going to shoot." When appellant was at Miller's he said nothing about anybody being dead over at the cabin. As to whether appellant was intoxicated, witness testified, "I would say that he was—very much so."

There was an intimation of a motive for the killing in the testimony of Officer Jones, who said that appellant, after his arrest, when asked why he killed Brunner, replied, "He owed me forty dollars." Other officers who were present at the time did not testify to such a remark by appellant. Appellant testified that Brunner never owed him $40, and no evidence, other than that already referred to, was offered that he did. The state, on page 11 of its brief in this court, expressly admits that the evidence does not disclose any motive for the killing.

In addressing the jury, the then deputy district attorney, now district attorney, used this language: "I don't know what happened in there—it is impossible to tell what happened—there was no one in this house but the defendant and the deceased—what occurred there God only .knows—but there is no evidence whatever of any violent act by Eddie Brunner." Respondent's brief, in the same connection, says: "Just what happened in that room prior to the killing the evidence does not disclose."

■ The testimony quoted and referred to herein is but a small part of that given at the trial. The evidence taken as a whole was sufficient to warrant the conclusion that appellant committed the homicide; that the offense was murder; but in our opinion the evidence was not sufficient to convince a jury beyond a reasonable doubt that the killing was "willful, deliberate and premeditated."

■ We have given due consideration to the errors alleged to have occurred at the trial. In his closing argument to the jury, referring to certain testimony given by state's witness, Frank Jones, the then district attorney said: "Counsel would want you to believe Jones came up here and deliberately lied. I want to say to you, my friends, that I knew Frank Jones' father and mother before Frank Jones was ever born—clear back in 1898—I worked with Frank Jones' father—" At this point an objection was interposed, and the court said: "Mr. Harmon, you will please confine your argument to the evidence and the jury are instructed to disregard any argument of counsel that does not conform to the evidence." Notwithstanding this admonition, the district attorney proceeded as follows: "And I know that boy—I know his family—and I will tell you that Frank Jones will not lie—Frank Jones did not get up here and deliberately lie." In view of defendant's stipulation in this court that the evidence at the trial was sufficient to warrant a verdict of murder of the second degree, we do not decide whether the district attorney's remarks would otherwise require a reversal in this case. But it

is proper to observe, without in any way reflecting upon Officer Jones' credibility, that an attorney should never yield to the temptation to make such statements to a jury when there is no foundation for them in the evidence.

The other assignments of error are without merit.

The jury having been fully justified in finding the appellant guilty of murder, but having in our opinion improperly fixed the degree of the crime and imposed the penalty therefor, the judgment of the lower court of murder of the first degree is hereby modified, and the cause remanded to the district court, with directions to enter a judgment against the defendant (appellant) finding him guilty of murder of the second degree, and to thereupon pronounce judgment upon him as prescribed by law.