**Dennis Wayne CROZIER,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. 86–3.**

Supreme Court of Wyoming.

Aug. 5, 1986.

---

Leonard D. Munker, State Public Defender, Martin J. McClain, Deputy State Public Defender, and Julie D. Naylor, Appellate Counsel, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Senior Asst. Atty. Gen., and Sylvia Lee Hackl, Senior Asst. Atty. Gen., for appellee (plaintiff).

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

Appellant Dennis Crozier, convicted by a jury of second-degree murder for the strangulation death of six-year-old Frederic Gilbert Touney, III (Freddie), was sentenced to the penitentiary for not less than 30 nor more than 50 years, and now appeals, claiming improper introduction of certain hearsay and bad-acts evidence, an unsatisfactory jury instruction on intoxication, and

impermissible comment on his failure to testify. We find no adequately demonstrated basis for the asserted error, and affirm.

Crozier's four assignments of error are more completely stated as:

I. allowing a hearsay statement of the victim to be presented to the jury by testimony of a school counselor;

II. permitting testimony about marijuana when such testimony had no relevance to the crime charged;

III. instructing the jury that the defense of voluntary intoxication applied in connection with first-degree murder only and not second-degree murder or manslaughter; and

IV. violating the constitutional right to silence by the prosecutor's impermissible comment on appellant's failure to testify.

The State contrarily contends that:

I. "The victim's hearsay statements were properly admitted under Rule 804(b)(6) of the Wyoming Rules of Evidence."

II. "The trial court did not err in admitting into evidence statements of Bernadette Touney and Kathy McCord regarding appellant's attempts to obtain marijuana on the night of the murder."

III. "The trial court properly limited the applicability of Instruction 19, dealing with the effect of voluntary intoxication, to the charged offense of first degree murder, since second degree murder is not a specific intent crime."

IV. "The prosecutor's remarks during his closing argument were not comments on appellant's decision to not testify in his own behalf."

*What Happened*

The victim in this tragic affair was Freddie Touney, age six. His mother, Lorraine, worked for the Cheyenne newspapers as an inserter of fliers and advertisement sections, usually working split shifts, mostly at night. Crozier also had been employed as an inserter. In February, 1985, he came to work drunk, and Lorraine, who was su-

pervising, decided that he was risking becoming caught in the machines. She pulled his time card, clocked him out and reported him to the night supervisor at the newspaper, and he was fired.

The Touney family lived in a trailer court in south Cheyenne. Fred Touney is an unemployed social security recipient, totally disabled. He did, however, help his wife Lorraine at her newspaper job, which included delivery of newspapers from the dock to the post office for mailing. Since this work involved night shifts, the Touneys slept much of the day, frequently leaving their children unattended at night. Crozier lived in the same trailer court, and he occasionally came to the Touney house and would stay with the Touney children—Bernadette, age 13, Jeaninne, age 10, Freddie, age 6, Erica, age 5, and Scott, age 2½.

This practice of visiting the Touney home continued even after Crozier was fired. One such evening was Sunday, March 3, 1985. Shortly after Crozier's arrival, an altercation occurred when Freddie called Crozier a faggot, and Crozier then "popped him in the mouth." Mrs. Touney scolded them, and then left the oldest child, Bernadette, with instructions to send Crozier home and Freddie to bed if there was further trouble. Mr. and Mrs. Touney left for work at about 9:30 p.m., and did not return home until approximately 2:30 a.m.

After the parents left, Crozier began watching television with the children. He had a cold, and he brought with him a pitcher of toddy which his roommate had mixed for him, containing a *"whole bottle of brandy"* (emphasis added) and a gallon of lemonade.

At about 10:00 p.m., Crozier asked Bernadette to go to a neighbor, Kathy McCord, to see if she would find him some marijuana. Bernadette complied, and Kathy and Bernadette returned together to the Touney home, where Kathy told Crozier that she would try to locate some marijuana for him. Kathy and Bernadette left together, stopped at two neighbors' trailers, but were unable to acquire any marijuana. On returning, Freddie and nine-year-old Jean-inne Touney were smoking cigarettes, causing Kathy and Crozier to start an argument over his letting these small children smoke. At some point, Kathy began playing with Freddie's dog. Freddie thought she was hurting the dog, and called her a bitch. Crozier said to Freddie, "Shut up right now before I hit you." Freddie responded, "You ain't going to hit me," to which appellant retorted, "You want to make a bet?" Bernadette intervened and the two stopped arguing. When Kathy McCord tried to leave, Crozier blocked the front door and chased her down the hall to the back door, dragging her back into the living room. More arguing ensued, after which Kathy got away and went home. The trial evidence was not pleasant, and the factual situation could hardly accord with the American dream.

Jeaninne went to bed, Freddie went to his parents' bed as was his usual practice, and Bernadette and Crozier continued to watch television, although he repeatedly distracted Bernadette from watching television, and she repeatedly told him to "shut up." He picked her up, and she said, "Put me down right now." Crozier said, "Why, do you think I'm going to hurt you?" Bernadette responded, "I don't know," after which appellant said, "I wouldn't hurt your family. The only one I might hurt was Freddie."

Bernadette went to bed, stopping first to check on Freddie, who was resting in his parents' bed. The boy was awake, and complained of a stomachache and a headache. Bernadette listened to her radio for a time after she went to bed, until about 11:30 p.m., when she saw Freddie walk down the hall past her room toward the living room. She heard him say hoarsely, "Dennis, I don't feel well." She fell asleep, and was awakened later, when Crozier came into her room to say that he was leaving. Bernadette heard the front door shut, went to the living room to assure herself that the door was shut, checked on two-and-a-half-year-old Scotty in her parents' room, and then called to Freddie in

the darkness of her parents' bedroom. He did not respond, and she went back to bed.

She was awakened when her parents returned home, and Mrs. Touney found Freddie's limp body in his sister Erica's bottom bunk bed. They carried Freddie to the living room, laid him on the floor, and began performing mouth-to-mouth resuscitation, while the father went to a neighbor's house for a telephone to call an ambulance. Bernadette then went to the mobile home of Crozier and his roommate. Crozier followed Bernadette home and began helping Mrs. Touney with cardio-pulmonary resuscitation until a sheriff's deputy arrived to check Freddie for a pulse, and there was none. Crozier continued mouth-to-mouth resuscitation, and hollered at Freddie, "You can't do this to me. No one dies around me."

When the ambulance arrived, one of the attendants inquired about the marks on Freddie's neck, to which no one responded. A neighbor who arrived on the scene also asked about the marks on Freddie's neck, to which Crozier responded, "Those? Don't worry about them."

One deputy testified that Crozier kept repeating to Mr. Touney that he was sorry, that it was his fault. All efforts to revive the boy were unsuccessful, and he was pronounced dead at 3:23 a.m. Crozier was questioned, allowed to return home, and then was arrested that morning for murder.

The autopsy pathologist testified at trial that Freddie had a contusion on his left eyelid, abrasions on the nose and face, extensive neck abrasions, some in a criss-cross pattern, scrape wounds on the thigh, and an injury to the back of the head. The liver was also lacerated due to a blunt-force injury; there was bleeding around the pancreas; and the brain showed signs of cerebral edema, indicating a significant degree of trauma to the brain. The neck abrasions indicated that something had been wrapped around his neck and twisted. The pathologist concluded that Freddie was strangled, his best estimate being that the injuries occurred between 10:30 p.m. and 12:30 a.m., minutes before his death.

A statement of Crozier about the evening's events was suppressed by appropriate motion after hearing and comprehensive court ruling premised on constitutional questions.

Crozier was tried by a jury for first-degree murder. The defense rested, without presenting any witnesses, and the jury convicted Crozier of the lesser included offense of second-degree murder.

### Hearsay Evidence—Testimony of the School Counselor

One of the four issues raised in this appeal involves the admissibility of testimony of Vicky Anderson, a counselor at Freddie's elementary school who had been working with Freddie on his learning disability and behavior problems for a year. This witness testified that during the year the child had made academic progress and improvements in his social and behavior problems, except that about two weeks before his death Freddie had displayed "some extremely deviant behavior." On February 27, 1985, Ms. Anderson began his annual evaluation, consisting of a series of assessment tests, one of which involved Ms. Anderson beginning a sentence which the child was to complete. When Ms. Anderson said, "If I could do anything I wanted to do," Freddie completed the sentence by saying, "I'd run away from home." When Ms. Anderson said, "I like my father, but," Freddie said, "I wish he would quit kicking me." As the test continued, Freddie told Ms. Anderson that if he could change anything he would not have Crozier babysit for him any more because the man was mean to him. When questioned further, Freddie would not elaborate. He was so nervous and distractable that the evaluation was concluded. Ms. Anderson also testified that over the year she had worked with Freddie she found him to be a reliable, truthful child.

Before evidence introduction commenced, the trial court and counsel met in chambers to discuss the admissibility of this testimo-

ny pursuant to Rule 804(b)(6), W.R.E. Ms. Anderson was then questioned by defense counsel in chambers to verify whether there was sufficient background information concerning the circumstances under which the hearsay statement was made, to provide the jury with an adequate basis to evaluate its veracity. The prosecutor argued the existence of the introduction criteria required by *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), and more recently by *Schmunk v. State*, Wyo., 714 P.2d 724 (1986).

" '[I]n order for hearsay to be admissible under the catchall exception [Rule 804(b)(6), W.R.E.], *certain requirements must be satisfied.* First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness * * *.' " 714 P.2d at 738, quoting from *Hopkinson v. State*, supra, 632 P.2d at 131.

In addition to the requirements of Rule 804(b)(6), W.R.E., this court has imposed additional limits upon the admissibility of hearsay pursuant to the confrontation clause of the Sixth Amendment to the United States Constitution and Art. 1, § 10 of the Wyoming Constitution by requiring sufficient background information concerning the circumstances under which the hearsay statement was made to provide the jury with an adequate basis to evaluate its veracity. *Schmunk v. State*, supra; *California v. Green*, 399 U.S. 149, 155–156, 90 S.Ct. 1930, 1933–1934, 26 L.Ed.2d 489 (1970). See also *United States v. Balano*, 618 F.2d 624, 628 (10th Cir.1979), cert. denied 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *Ohio v. Roberts*, 448 U.S. 56, 63–66, 100 S.Ct. 2531, 2538–2539, 65

L.Ed.2d 597, 607–608 (1980); 4 Louisell & Mueller, Federal Evidence § 418, pp. 146–150. See *Williams v. Collins Communications, Inc.*, Wyo., 720 P.2d 880 (1986).

In discussion in chambers, the prosecutor asserted that each requirement would be met:

(1) The declarant was unavailable. Freddie was dead.

(2) Notice of the prosecutor's intent to use the hearsay statements of the deceased victim as related by Vicky Anderson was made on October 11, more than two weeks before the trial began on October 28, 1985. A summary of Ms. Anderson's statement was also made available to defense counsel.

(3) The truth of the matter asserted was evidence of a material fact in this case. The prosecution was attempting to prove the element of premeditation necessary for a first-degree murder conviction, and Freddie's statement that Dennis was mean to him was material on that point.

(4) The statement was more probative than any other evidence which could be procured through reasonable efforts. Because Freddie's statement was made to Ms. Anderson on February 27, several days before Freddie was murdered, it was probative on the issue of premeditation, and was Freddie's only means of addressing the element of premeditation.

(5) The statement was supported by special guarantees of trustworthiness. Ms. Anderson was a school counselor, not a criminal investigator, and the setting under which Freddie was being evaluated was the casual completion of unfinished sentences. Finally, the declarant was a six-year-old child who had no reason to fabricate his story about his babysitter.

After the judge had questioned Ms. Anderson and evaluated the circumstances under which the hearsay statement was made, he ruled:

"* * * The court will permit the statement to come in. I find that he is unavailable. I find that there has been notice. I find that the statement for what

it purports to be is trustworthy. I find that it certainly is probative of the relationship that existed at that time between Freddie and the babysitter, Dennis, which is a matter that's material to this proceedings. In fact, I would be willing to instruct * * * when this evidence comes in that that would be the purpose for them hearing the evidence. And that that relationship certainly is a material fact in terms of this entire proceedings * * *."

▬ As this court has said in the past, hearsay evidence, ordinarily inadmissible, may be admitted under an exception to the hearsay rule if the rule requirements are met. *Schmunk v. State*, supra. We concur with the trial judge's decision permitting introduction. Freddie was dead, and not from natural causes.

The victim's relationship and feelings toward the defendant, his unsolicited remark to a school counselor just days before he was murdered by his babysitter that his babysitter was mean to him, was material to that issue. The victim's statement was also material to the element of malice. The jury was instructed that the term "malice" conveys the meaning of hatred, ill will, or hostility toward another and implies a wicked condition of mind.

In *Schmunk v. State*, supra, 714 P.2d at 739, we said that if the proposed hearsay statement is relevant, the material-fact requirement of Rule 804(b)(6) is satisfied. 4 Louisell & Mueller, Federal Evidence § 491, p. 1202. We further said that relevant evidence is:

" '* * * evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401, W.R.E." 714 P.2d at 739–740.

Support is found in *Alcala v. State*, Wyo., 487 P.2d 448 (1971), cert. denied 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466, reh. denied 406 U.S. 911, 92 S.Ct. 1613, 31 L.Ed.2d 823 (1972), wherein evidence was introduced that the victim's husband had made prior threats:

" * * * [T]he statement attributed to Mrs. Alcala denotes ill feeling and hostility. We fail to see in it anything damaging to the defendant except that it would tend to prove motive and malice, which would be essential for a conviction of second degree murder." 487 P.2d at 455.

Freddie's hearsay statement as related by Vicky Anderson was relevant evidence of malice, premeditation, identity of the perpetrator, and the relationship of the perpetrator to the victim.

▬ The appellant also contends that Freddie's hearsay statements were not supported by circumstantial guarantees of trustworthiness because there is no way to know what Freddie meant when he made the statements, and because there is not enough information as to what the statements related. These contentions go to the weight to be placed on the statements rather than the circumstantial guarantees of trustworthiness of the statements. See *Furtado v. Bishop*, 604 F.2d 80 (1st Cir. 1979), cert. denied 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). To determine trustworthiness of a hearsay statement involves an evaluation of the corroborating facts which further indicate veracity of the statement, the circumstances and conditions under which the statement was made, the incentive which the declarant may have had to be truthful or untruthful, and any factors contributing to the reliability of the report as related by the witness. *United States v. Bailey*, 581 F.2d 341 (3d Cir.1978). Whether a hearsay statement is sufficiently trustworthy is a matter within the sound discretion of the trial court. *State v. Whyde*, 30 Wash.App. 162, 632 P.2d 913 (1981).

The trial judge in this case carefully questioned the witness before ruling on the admissibility of her testimony. He asked her about the methods she used to establish rapport with young people, the manner in which she conducted the annual assessment to assure its accuracy, and whether or not the information received from Freddie was cross-checked with past records

and also verified with Freddie's teachers. The satisfactory responses received from Ms. Anderson to each of his questions supplemented the examination by defense counsel and assure this court that the trial judge admitted Ms. Anderson's testimony only after a careful evaluation, consistent with the factors required for compliance with both the Wyoming and United States constitutions. See *United States v. Bailey,* supra.

Exercised discretion is decisional resolution of conflicting facts and factors including the duty to consider and the right to reject alternative choices. *"Discretio est scire per legem quid sit justum.* Discretion consists in knowing through the law what is just." Burton's Legal Thesaurus (1980) at 172.

### Admissibility of "Bad Acts"

Immediately after 13-year-old Bernadette Touney, the oldest sister, was sworn to be a witness, defense counsel requested a bench conference, and then moved for exclusion pursuant to Rule 404(b), W.R.E., of any reference to Crozier asking that Bernadette find Kathy McCord to obtain some marijuana for him. The prosecutor responsively argued that the evidence was critical because in the cross-examination of the pathologist who performed the autopsy there was some question whether Freddie was still alive around 10:00 or 10:30 p.m., and that it was also relevant to explain why Kathy McCord, the next witness, was at the Touney home so late at night. The motion was denied and the evidence admitted.

On appeal, appellant contends that this evidence was not relevant, was prejudicial, and placed him on trial for being a bad person.

Rule 404(b), W.R.E., provides:

"(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The trial judge, in denying appellant's motion to exclude the evidence, properly acknowledged that prior bad acts may be admissible under certain circumstances. Wyoming case law reinforces the trial judge's remark:

"Our court, in *State v. Lindsay,* 77 Wyo. 410, 317 P.2d 506, 510, recognized that evidence is not to be excluded because it tends to show the commission of other offenses 'where it tends to prove facts material in the trial.'" *Valerio v. State,* Wyo., 429 P.2d 317, 318 (1967).

■ Another recognized exception to the Rule 404(b) exclusionary rule is that evidence of other criminal activity is admissible if it "forms part of the history of the event or serves to enhance the natural development of the facts." *Commonwealth v. Evans,* 343 Pa.Super. 118, 494 A.2d 383, 390 (1985); *Commonwealth v. Murphy,* 346 Pa.Super. 438, 499 A.2d 1080, 1083 (1985). Pennsylvania refers to this as the "same transaction" rule. It is also known as the "complete story" exception. *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101, application denied 434 U.S. 1323, 98 S.Ct. 8, 54 L.Ed.2d 34, reh. denied 434 U.S. 976, 98 S.Ct. 1537, 54 L.Ed.2d 469 (1977); *State v. Collins,* 111 Ariz. 303, 528 P.2d 829 (1974). The exception has also been recognized in Wyoming. *Hopkinson v. State,* supra. In Wyoming perhaps it would be characterized as the "course of conduct" exception. *State v. Lindsay,* 77 Wyo. 410, 317 P.2d 506 (1957). See also *Hatheway v. State,* Wyo., 623 P.2d 741 (1981); *State v. Grider,* 74 Wyo. 88, 284 P.2d 400, reh. denied 74 Wyo. 88, 288 P.2d 766 (1955). See also 1A Wigmore on Evidence § 218; 2 Louisell and Mueller, Federal Evidence § 140; Annot., 41 A.L.R. Fed. 497, 515, Admissibility Under Rule 404(b), of Federal Rules of Evidence of Evidence of Other Crimes, Wrongs, or Acts Not Similar to Offense Charged.

The probative value of this evidence must outweigh its prejudicial effect. *Noetzelmann v. State*, 721 P.2d 579 (Wyo.1986).

In appealing his first-degree murder conviction in *State v. Richmond*, supra, appellant claimed as error the playing at trial of a tape in which he recounted his version of the circumstances surrounding the murder:

" * * * In the course of his narration the defendant mentioned that he and Faith smoked marijuana while parked at the Birdcage awaiting Becky and that after dividing the proceeds of the robbery he and Faith 'fixed up again.' He also stated that Becky Corella was carrying a pistol on the night in question. The defendant argues that those isolated pieces of testimony painted him as a marijuana smoker, a dope addict and a gun carrier, and that none of these facts is relevant to the crime charged." 560 P.2d at 48.

The Arizona Supreme Court held that: " * * * The defendant's explanation of the events which happened preceding and subsequent to the homicide were admissible in order that the full story could be understood. There was no error in the admission of the evidence." 560 P.2d at 49.

We also find the case of *State v. Hockings*, 29 Or.App. 139, 562 P.2d 587, cert. denied 434 U.S. 1049, 98 S.Ct. 899, 54 L.Ed.2d 802 (1977), particularly helpful in this discussion:

"When approaching the question of admissibility of 'other crime' evidence courts often state as a rule that this evidence is inadmissible unless it comes under one of the many exceptions to that particular exclusionary rule. To state such a general rule masks the complete progression of analysis in determining admissibility. It is more proper to first determine if the proffered evidence is relevant, without regard to its character, and then determine if there is some recognized exclusionary rule in the law of evidence which would nevertheless keep it out." 562 P.2d at 590.

The evidence admitted in the case at bar was convincingly relevant and particularly so for the State. Since appellant did not testify, Bernadette was the only witness who could give an account of the entire evening of March 3 as it unfolded at the Touney home. The only time that Bernadette was not at home during the evening was at about 10:00 p.m., when she went to find Kathy McCord, to obtain some marijuana for the appellant. Kathy and Bernadette visited other neighbors in their search for marijuana, and then Kathy returned with Bernadette to the Touney trailer. Some explanation for Bernadette's late-night visit to Kathy and the time lapse before both returned to the Touney home was a necessary ingredient to the jury's complete understanding of the times and events of the evening as related by Bernadette. It was also relevant to afford an explanation for Kathy's visit to the Touney home that night, in addition to the State's purpose of establishing that Freddie was still alive at that time.

The same-transaction rule addressed by the Pennsylvania courts appropriately applies, and we adopt the principle stated.

" * * * The time sequence of the [crime] is not continuous if there is some sort of a legal timeout taken during periods while the defendant is committing other crimes * * *." *United States v. Gibson*, 625 F.2d 887, 888 (9th Cir.1980).

A differentiation must be recognized between "bad acts" removed from the immediate transaction and all rules appropriate to such evidence, and the immediate-circumstance (same-transaction) evidence to which the rule to be applied is inordinate prejudice without reciprocal probative justification. What happened here should normally be admissible unless the prejudice factors overweight relevancy. See *Noetzelmann v. State*, supra. No error in admission of the evidence resulted under the facts of this case.

### Intoxication as a Defense to Second-Degree Murder

On the night of the murder, Crozier had been drinking a toddy made of a whole

bottle of brandy and a gallon of lemonade. Trial testimony also revealed that Crozier had consumed other alcohol as well that night. Bernadette Touney testified that when Crozier came to her bedroom to inform her that he was going home, he fell against the wall. This evidence at trial raised an issue of intoxication for the jury.

As the most challenging question in this murder conviction, the jury was instructed on the intoxication issue as follows:

"Voluntary intoxication is no excuse for the commission of a crime. However, pertinent portions of the Wyoming statutes provide that 'where a crime rests in intention, the inebriated condition of the defendant at the time of committing the offense may be proved to the jury, as bearing upon the question of intention.'

"Thus, evidence that a defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the defendant acted, or failed to act, with specific intent as charged.

"This instruction only applies for your consideration with respect to murder in the first degree and not to either murder in the second degree or manslaughter."

■ Appellant contends that intoxication should have been considered by the jury as bearing upon the question of intention regarding the second-degree murder charge. A toddy of a whole bottle of brandy in a gallon of lemonade could raise a jury question of intoxication. It is clear that in Wyoming intoxication may negate the existence of a specific-intent element of a specific-intent crime but is not a factor affecting a general-intent crime. *McDonald v. State*, Wyo., 715 P.2d 209 (1986);

*Simmons v. State*, Wyo., 674 P.2d 1294 (1984); *Carfield v. State*, Wyo., 649 P.2d 865 (1982); § 6–1–202(a), W.S.1977 (1983 Replacement).[1] The determination required to decide this case is whether second-degree murder is a general-intent crime or a specific-intent crime.

Second-degree murder is defined in Wyoming as:

"Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life." Section 6–2–104, W.S.1977 (1983 Replacement).

The wording of the homicide statutes in Wyoming was not substantially changed when the legislature revised the criminal code in 1983. The criminal code revision subcommittee of the Joint Judiciary Interim Committee, in its 1981 first draft, proposed to combine first-degree and second-degree murder into one offense. The subcommittee was heavily criticized for its proposal, because the draft, if enacted, would destroy 90 years of Wyoming case law in the area of homicide. The subcommittee subsequently chose to retain the existing second-degree murder statute without change. Thus, Wyoming case law which predates the criminal code revision and is interpretative of the second-degree murder statute is helpful in this discussion.[2]

*Gustavenson v. State*, 10 Wyo. 300, 68 P. 1006 (1902), is the earliest case which aids us in our discussion. Gustavenson shot the victim during a scuffle involving five workers, all drunk, as they were returning to

1. Section 6–1–202(a), W.S.1977 (1983 Replacement) reads:

"(a) Self-induced intoxication of the defendant is not a defense to a criminal charge except to the extent that in any prosecution evidence of self-induced intoxication of the defendant may be offered when it is relevant to negate the existence of a specific intent which is an element of the crime."

Prior to the Criminal Code revision, no version of this statute limited its application to specific-intent elements. Yet, long before the statute

was amended in 1982 to apply only to specific intent the Wyoming Supreme Court had by judicial interpretation restricted its application to specific-intent elements only. *Gustavenson v. State*, 10 Wyo. 300, 68 P. 1006 (1902).

2. The elements of second-degree murder have been "purposely and maliciously" since before statehood. See *Cook v. Territory*, 3 Wyo. 110, 4 P. 887 (1884). See also Lauer, *Goodbye 3–Card Monte: The Wyoming Criminal Code of 1982*, XIX, Land and Water L.Rev. 107 (1984).

work on the railroad grade from Laramie after attending a funeral. At his trial, the defendant requested an instruction relating to drunkenness as an excuse for commission of a crime, bearing upon the question of intent. The court gave the instruction with the qualifier that:

> " ' * * * This instruction applies only to murder in the first and second degrees, and not to manslaughter.' " 68 P. at 1010.

Gustavenson contended on appeal that the instruction was erroneous—that the instruction should have applied to manslaughter as well. The court held that there was not error in the instruction given to the jury to which the defendant had any right to complain, since he was convicted of second-degree murder and received an instruction on intoxication bearing upon the issue of intent in second-degree murder to which he was not entitled. The court held:

> " * * * But it is proper to be observed, though the point does not affect this case, that in reason and upon the authorities the court erred in applying the principle stated in the instruction to murder in the second degree. * * * What constitutes murder in the second degree by a sober man is equally murder in the second degree if committed by a drunken man." 68 P. at 1010.

Gustavenson was cited with approval on this issue in the 1971 case of *Teton v. State*, Wyo., 482 P.2d 123.

Our discussion on intoxication and its bearing on second-degree murder could end here if not for the troublesome question presented by the appellant's brief regarding *Peterson v. State*, Wyo., 586 P.2d 144 (1978). Peterson was tried and convicted of second-degree murder. A portion of the instruction given to the jury on the issue of intoxication includes the following:

> " 'If the jury believes from the evidence that the defendant did the shooting at a time when he was so intoxicated from alcohol as to render him incapable of forming an intent to kill and of being incapable of premeditation, you should find the defendant not guilty of murder

in the first degree or murder in the second degree.' " (Emphasis omitted.) 586 P.2d at 153 n. 10.

The court in Peterson approved this instruction, finding no prejudice or error. As a result, we now consider in some detail whether second-degree murder is a general-intent crime or a specific-intent crime, affirming or rejecting the dicta statement in *Peterson v. State*, supra.

 General intent implies that the intent is not an element of the crime and requires that the prohibited conduct must be undertaken voluntarily. *Armijo v. State*, Wyo., 678 P.2d 864 (1984); *Felske v. State*, Wyo., 706 P.2d 257 (1985). Specific intent means that the intent is or may be made an element of the crime which must be proved beyond a reasonable doubt as any other fact in the case. *Dean v. State*, Wyo., 668 P.2d 639 (1983).

The court in Dean went on to further explain the difference between specific and general intent:

> " '* * * "When the definition of a crime consists of only the description of a particular act, without reference to *intent to do a further act or achieve a future consequence*" the fact that the defendant intended to do the proscribed act makes that crime a *general criminal intent* offense. (Emphasis added.) "When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of *specific intent*." * * * ' (Emphasis in original.) *People v. Love*, 111 Cal.App.3d Supp. 1, 168 Cal. Rptr. 591, 600 (1980).
> " '* * * A specific intent crime is one in which a particular intent is a necessary element of the crime itself. * * * ' *Russell v. State*, Fla.App., 373 So.2d 97, 98 (1979)." 668 P.2d at 642.

This court also attempted to explain the difference between general and specific intent in *Dorador v. State*, Wyo., 573 P.2d 839, 843 (1978):

> "Realizing that the distinction between a specific intent crime and a general intent

crime is apparently troublesome, we can perhaps clarify it by stating it in a somewhat different way. When the statute sets out the offense with only a description of the particular unlawful act, without reference to intent to do a further act or achieve a future consequence, the trial judge asks the jury whether the defendant intended to do the outlawed act. Such intention is general intent. When the statutory definition of the crime refers to an intent to do some further act or attain some additional consequence, the offense is considered to be a specific intent crime and then that question must be asked of the jury." 573 P.2d at 843.

Applying Dean, Dorador and other cases, we will address individually the elements of second-degree murder—maliciously, purposely and, because the appellant raises the issue, intent to kill—to determine whether one of these elements provides the specific intent necessary to require an instruction on intoxication.

*Maliciously:*

Malice has been held by this court and by many other courts to be a general-intent element.

In *Dean v. State*, supra, appellant argued that "willfully and maliciously" are specific intents. This court held that:

" * * * Obviously, such is not so. These words describe the act to be committed and not an intention to produce a desired specific result. Any intent to be derived from them is a general intent." 668 P.2d at 642.

In discussing the word "maliciously," Justice Thomas said in his concurring opinion in *Fuller v. State*, Wyo., 568 P.2d 900 (1977), a case of aggravated assault with intent to commit second-degree murder:

" * * * We have noted that the term 'maliciously' embraces, amongst other things, the element of unlawful intent. *Evanson v. State*, Wyo., 546 P.2d 412 (1976); *Elliott v. State*, 47 Wyo. 36, 30 P.2d 791 (1934). I conclude that when the legislature incorporated the term 'maliciously' in the statute the word connoted nothing more than unlawful intent

or general intent. If the legislature intended to encompass a specific intent within the statute, it would have done so specifically." 568 P.2d at 904.

We have also held that malice may be inferred from the facts and circumstances. *Leitel v. State*, Wyo., 579 P.2d 421 (1978); *Doe v. State*, Wyo., 569 P.2d 1276, 1279 (1977); *Eagan v. State*, 58 Wyo. 167, 128 P.2d 215, 225 (1942).

North Carolina's definition of second-degree murder is somewhat similar to ours.

"Second degree murder is the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Huggins*, 71 N.C.App. 63, 321 S.E.2d 584, 587 (1984), review denied 313 N.C. 333, 327 S.E.2d 895 (1985).

See also *State v. Wrenn*, 279 N.C. 676, 185 S.E.2d 129 (1971).

In North Carolina, malice is a general-intent element which may be either express or implied:

"While an intent to kill is not a necessary element of second degree murder, the crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death. *State v. Wrenn*, supra, 275 N.C. 676, 185 S.E.2d 129 (Sharp, J., now C.J., dissenting); *State v. Benton*, supra, 276 N.C. 641, 174 S.E.2d 793; *State v. Phillips*, supra, 264 N.C. 508, 142 S.E.2d 337; *State v. Williams*, supra, 235 N.C. 752, 71 S.E.2d 138. We question the universal applicability of the statements in Williams, quoted in Phillips, that 'an intent to inflict a wound which produces a homicide is an essential element of murder in the second degree,' and in Benton that 'second-degree murder ... imports a specific intent to do an unlawful act.' It is more fundamentally sound to say, as did Justice, now Chief Justice Sharp, in her dissent in Wrenn, that any act evidencing 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to in-

jure a particular person' is sufficient to supply the malice necessary for second degree murder. Such an act will always be accompanied by a general intent to do the act itself but it need not be accompanied by a specific intent to accomplish any particular purpose or do any particular thing." *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905, 917, 98 A.L.R.3d 285 (1978).

See also *State v. Lang*, 309 N.C. 512, 308 S.E.2d 317 (1983).

In North Carolina, intoxication may negate the specific intents of premeditation and deliberation necessary to prove first-degree murder, but it is not a defense to second-degree murder. *State v. King*, 49 N.C.App. 499, 272 S.E.2d 26 (1980), review denied 302 N.C. 220, 276 S.E.2d 917 (1981); *State v. Couch*, 35 N.C.App. 202, 241 S.E.2d 105 (1978).

The same is also true in Michigan, where: "* * * Voluntary intoxication does not negate the malice element of second-degree murder because it is a crime of general intent." *People v. Vasquez*, 129 Mich.App. 691, 341 N.W.2d 873, 875 (1983).

See also *People v. Langworthy*, 416 Mich. 630, 331 N.W.2d 171 (1982).

*Purposely:*

We have quoted from this court's opinion in Dean v. State, supra, that any intent to be derived from the terms "willfully and maliciously" is a general intent. We went on in Dean to say that:

"* * * [W]illfully means intentionally, knowingly, *purposely*, voluntarily, consciously, deliberately, and without justifiable excuse, as distinguished from carelessly, inadvertently, accidentally, negligently, heedlessly, or thoughtlessly. [Citations.]' *Matter of Adoption of CCT*, Wyo., 640 P.2d 73, 76 (1982)." (Emphasis added.) 668 P.2d at 642.

See also *Saldana v. State*, Wyo., 685 P.2d 20 (1984), cert. denied — U.S. —, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985).

Thus, we held in Dean that "willfully and maliciously" were general-intent elements. We defined "willfully and purposely" as being synonymous in *Matter of Adoption of CCT*, Wyo., 640 P.2d 73, (1982). "Purposely" is the requirement of the second-degree murder statute. Therefore, "purposely" is a general-intent element. The word "purposely" as used in the second-degree murder statute describes the act to be committed and not an intention to produce a desired, specific result. *Dean v. State*, supra. The element which makes first-degree murder a specific-intent crime and separates it from the general-intent crime of second-degree murder, is the element of premeditation.

In *State v. Sheets*, 94 N.M. 356, 610 P.2d 760, 770 (1980), the New Mexico Court of Appeals said that the term "willfulness" is covered in the general-intent jury instruction by the words "purposely does an act," and an instruction on general intent must be given to a jury following instructions on second-degree murder and voluntary manslaughter. *State v. Curlee*, 98 N.M. 576, 651 P.2d 111, 112, cert. denied 98 N.M. 590, 651 P.2d 636 (1982). In New Mexico, as in Wyoming, willfully and purposely are synonymous, are general-intent elements, and second-degree murder is a general-intent crime.

The word "willfully" was also defined in the California Penal Code:

"* * * The word has the meaning defined in Penal Code section 7, subdivision 1, which specified that 'The word "willfully" when applied to the intent with which an act is done or omitted, implies simply a *purpose* or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or injure another, or to acquire any advantage.'" *People v. Atkins*, 125 Cal.Rptr. 855, 861, 53 Cal. App.3d 348 (1975).

The defendant in Atkins was convicted of willfully inflicting corporal punishment on a child, generating the above discussion concerning the word willfully. He was also convicted of second-degree murder in the beating death of his girl friend's two-and-one-half-year-old son, and the Califor-

nia Court of Appeal held that the trial court's refusal to give a specific-intent instruction was not only errorless—it would have been error to give it.

*Intent to Kill:*

Appellant in his brief concludes that the specific intent required by the second-degree murder statute is the intent to kill. Appellant supports this conclusion with this quote from the second-degree murder conviction appeal in *Smith v. State,* Wyo., 564 P.2d 1194, 1198 (1977):

"Purposely denotes intent. Use of a deadly weapon gives rise to a presumption of intent to kill."

The quoted language does not say that "purposely" denotes the specific intent to kill; nor does it say that intent to kill is a specific-intent element of the crime.

Appellant also cites *Nunez v. State,* Wyo., 383 P.2d 726 (1963) for support of his conclusion that intent to kill is a specific-intent element of second-degree murder. Nunez says that:

"In order to sustain a conviction of second degree murder, it was incumbent on the State not only to prove beyond a reasonable doubt that Nunez killed McCullum, but also that he killed him both 'purposely' and 'maliciously.'

"By definition the word 'purposely' means intentionally or deliberately. We need then to see whether the evidence is sufficient to show beyond reasonable doubt that Nunez *intended to kill* McCullum, and if so, whether he did it maliciously." (Emphasis added.) 383 P.2d at 728.

We do not read Nunez to support appellant's conclusion that second-degree murder is a specific-intent crime. In fact, the next sentence in Nunez says:

"In *State v. Parmely,* 65 Wyo. 215, 199 P.2d 112, 118, where the accused was charged with assault and battery with intent to kill and murder, this court approved an earlier decision holding that the specific intent to kill must be proved

as any other factor in a case." 383 P.2d at 728.

▮ This sentence illustrates the difference between a general-intent and a specific-intent element. The crime charged in Parmely was "assault and battery with intent to kill and murder." Obviously, the intent to kill is a specific-intent element of that crime. It fits the earlier definition from *Dean v. State,* supra, of a specific-intent crime. The statutory definition of second-degree murder in Wyoming carries no such specific intent, and we have already said that the words purposely, deliberately, and intentionally are synonymous with the word willfully, and this court has already held that the intent to be derived from the word willfully is a general intent. *Dean v. State,* supra; *Matter of Adoption of CCT,* supra.

The Supreme Court of Nevada has held that the specific intent to kill need not be found when the crime charged is second-degree murder, *State v. Holdaway,* 56 Nev. 278, 48 P.2d 420 (1935); *Hancock v. State,* 80 Nev. 581, 397 P.2d 181 (1964), and that second-degree murder is a general-intent crime.

Wisconsin defines the intent required by second-degree murder not as the specific intent to kill but as the "constructive intent" to kill—intent imputed by law where there is no actual intent to kill. *Seidler v. State,* 64 Wis.2d 456, 219 N.W.2d 320, 67 A.L.R.3d 890 (1974).

The North Carolina Supreme Court interpreting a second-degree murder statute which is similar to ours, has also held that the intent to kill is not a necessary element of second-degree murder. *State v. Wilkerson,* supra.

Only in Missouri, where second-degree murder is defined by common law as the willful, premeditated killing of a human being with malice aforethought, *State v. Franco,* Mo., 544 S.W.2d 533, 535 (1976), cert. denied 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977), did we find a court to

hold that specific intent to kill is a required specific-intent element of the crime to which intoxication is a defense.[3] *State v. Mannon,* Mo., 637 S.W.2d 674 (1982). Obviously, Missouri's definition of second-degree murder is most similar to our definition of first-degree murder. In addition, prior to *State v. Mannon,* supra, the Missouri Court of Appeals recognized that:

"* * * In a majority of states, as a matter of construction of specific intent or as a matter of policy, voluntary intoxication is not a defense to second-degree murder." *State v. Gullett,* Mo.App., 606 S.W.2d 796, 805 (1980).

See also *State v. Ritter,* Mo.App., 644 S.W.2d 387 (1982).

**3.** Although Missouri was alone among the states we researched in holding that second-degree murder is a specific-intent crime, we did not research the laws of every state. We also acknowledge that it is difficult to rely on case law from other jurisdictions, because the definition of second-degree murder and the case-law interpretations of the statutory terminology in each jurisdiction make these comparisons difficult. Our purpose in looking to case law from other jurisdictions was to determine whether any uniformity has developed between jurisdictions in defining malice, purpose and intent to kill as they relate to the concepts of general and specific intent.

**4.** Following is a short summary of some of the jurisdictions and cases which we surveyed but have not cited in this opinion:

Alabama: second-degree murder is not a specific-intent crime, and voluntary intoxication is no defense. *Rogers v. State,* 49 Ala.App. 78, 268 So.2d 859 (1972).

Colorado: second-degree murder was a specific-intent crime prior to 1977, and was transformed into a general-intent crime by the 1977 amendments to the Colorado Criminal Code. Prior to 1977, second-degree murder was defined in § 40–3–103(1), C.R.S.1963, 1971 Perm. Supp., as committed "when a person caused (a) 'the death of a person intentionally, but without premeditation;' or (b) '[w]ith intent to cause serious bodily injury to a person other than himself, he cause[d] the death of that person or of another person.'" *People v. Jones,* Colo., 668 P.2d 937, 939 (1983).

This was interpreted by the Colorado Supreme Court to be a specific-intent offense, and the voluntary intoxication defense applied to negate the specific intent essential to second-degree murder. *People v. Cornelison,* 192 Colo. 337, 559 P.2d 1102 (1977).

*Summary:*

Although the district judge in this case noted that

"Wyoming's definition of second degree murder may be unique as set forth in the statute,"

the crime of second-degree murder is a general-intent crime to which intoxication is no defense, in every jurisdiction we looked at, except for Missouri.[4]

■ We reaffirm this court's decision in *Gustavenson v. State,* supra, and in *Teton v. State,* supra, that second-degree murder is a general-intent crime to which intoxication is no defense, and any contrary language in *Peterson v. State,* supra, is superceded. We utilize a basic nature-of-the-offense criterion in this special general-intent analysis.[5]

The 1977 Criminal Code amendments to the second-degree murder statute repealed subsection (b) above, changed the element of "intentionally" to "knowingly," and then defined those terms, transforming second-degree murder into a general-intent crime. Offenses defined committed "intentionally" or "with intent" were declared to be specific-intent offenses. Offenses defined committed "knowingly" or "willfully" were declared to be general-intent offenses. Subsections 18–1–501(5) and (6), C.R.S.1973 (1978 Repl., Vol. 8). *People v. Gallegos,* Colo., 628 P.2d 999 (1981). Thus Colorado joined the majority of jurisdictions which find that second-degree murder is a general-intent offense to which the intoxication defense does not apply. *People v. Fite,* Colo., 627 P.2d 761 (1981).

Florida: voluntary intoxication is not a defense to second-degree murder because no degree of murder below first-degree murder is a specific-intent crime. *Linehan v. State,* Fla., 476 So.2d 1262 (1985); *Gentry v. State,* Fla.App., 422 So.2d 1072 (1982).

Kansas: second-degree murder is a general-intent crime. *State v. Roadenbaugh,* 234 Kan. 474, 673 P.2d 1166 (1983).

Pennsylvania: "malice aforethought" is a general-intent element. *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344 (1982). A finding of a specific intent to kill distinguishes first-degree murder from second-degree murder. *Commonwealth v. Fostar,* 455 Pa. 216, 317 A.2d 188 (1974).

South Dakota: second-degree murder is a general-intent crime. Failure to give intoxication instruction was proper. *State v. Primeaux,* S.D., 328 N.W.2d 256 (1982).

**5.** Our determination of the general-intent nature of second-degree murder does not necessarily define the intent status of other offenses which may, by the nature of the offense, have attrib-

## Impermissible Comment on Failure to Testify

In this comprehensively briefed appeal, appellant's final claim of error is that during closing argument the prosecutor commented on appellant's failure to testify on his own behalf in violation of his Fifth Amendment rights under the United States Constitution and Art. 1, § 11 of the Wyoming Constitution. We have held that such comment is plain error and is prejudicial per se. *Brewster v. State*, Wyo., 712 P.2d 338 (1985); *Westmark v. State*, Wyo., 693 P.2d 220 (1984).

██ The contentious questions addressed by this court in prior cases about the "per se" rule need not again be addressed here since we find no inappropriate comment was made. The prosecutor, in closing argument, said:

"Now, I detected some questions on cross-examination about where Fred, Sr. was and the incident three years ago, and Fred burned the fingers of little Freddie, the victim here. And perhaps you might have thought, well, I wonder if Fred, Sr. did this? He was coming and going from work and Village Inn, I think, and with his wife back and forth, but ladies and gentlemen, let me tell you one thing. Fred got right up here and denied it. He did not injure his child. You heard that under oath and subject to cross-examination. And I submit to you, Fred, Sr. did not do this to his child, and he told you that."

Appellant claims that this statement clearly inferred that if appellant had not injured Freddie, he too would have taken the stand and denied it. We disagree. Throughout the trial, information was revealed to the jury which could have raised suspicion in the minds of the jury about Freddie's father. It was brought out on direct examination, cross-examination, and redirect examination of Freddie's father that he had been charged with child abuse in an incident where he burned Freddie's hand. Freddie's father received two years probation for the incident and agreed to counseling. Further, the school counselor who had been working with Freddie testified that when Freddie was asked to complete the sentence which she had begun, "I like my father, but," Freddie responded, "I wish he would quit kicking me." She checked Freddie's legs for bruises, because she was aware of the situation with Freddie's father. On the night of Freddie's death, Fred, Sr. was alone for a time at around midnight, and he was specifically asked if he had returned home and during that time had injured Freddie. With denial, his credibility was placed in issue.

In his closing argument, appellant's attorney said:

"What about the Touneys? Fred, Lorraine, and Bernadette? They have feelings also. Fred had just gotten off probation, and obviously they don't want to lose their children. And obviously there's some things that have gone on in the family that don't sound very good. The condition of the house, the babysitting arrangements, et cetera. Are they going to want to, if not consciously, maybe subconsciously try and downplay their own parts or weaknesses, and is that going to affect their ability to recall accurately what was going on? Would what was going on affect their reaction of how much in fact Dennis did have to drink that night? And is it going to affect Bernadette and her fears about what if Dennis didn't do it? Is that going to affect what she remembers?"

The prosecutor obviously sensed that appellant's attorney had been effective in a very subtle way throughout the trial in keeping alive doubts about Freddie's father. It is not surprising that in his closing argument the prosecutor chose to confront directly the suspicions which members of the jury may have been entertaining about the father by attempting to close the door of doubt on that possibility. This is not an impermissible comment on appellant's failure to testify. The evidence in the case is

utes of specific intent as an intrinsic condition of the crime.

**58**

overwhelming in support of the jury verdict. We find no trial error.

Affirmed.